

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

FILED

MAR 2 4 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| Michael H. Wu and Christine T. Wu ) | |
| Plaintiffs, ) | |
| - against - ) | |
| Prudential Financial, Inc., ) | Civil Action No: 1:15-cv-02238 |
| John Robert Strangfeld Jr., ) | Judge: Milton I. Shadur |
| Mark Brown Grier, ) | Mag. Judge: Mary M. Rowland |
| Richard J. Carbone, ) | |
| Pruco Life Insurance Company, ) | |
| Citigroup Global Markets, Inc., ) | |
| John P. Havens, ) | **JURY TRIAL DEMANDED** |
| LSV Asset Management, ) | |
| Marsico Capital Management LLC, ) | MAR 2 4 2015 |
| T. Rowe Price Associates, Inc., ) | |
| William Blair & Company LLC, ) | THOMAS G. BRUTON |
| Defendants. ) | CLERK, U.S. DISTRICT COURT |
| ) | |

### AMENDED COMPLAINT

Plaintiffs, Michael H. Wu and Christine T. Wu, for their complaint against Defendants
Prudential Financial, Inc. ("PFI"; NYSE Ticker: "PRU"), et al. allege as follows:

### I. SUMMARY

1.   This case involves fraudulent offers, sales, and managements of Prudential
     Variable Annuities ("VA") by Prudential Financial Companies ("Prudential"), a
     2-stage embezzlement scheme consisting of (i) daily private sales ("stage 1")
     and (ii) quarterversary public registration ("stage 2"). Plaintiffs purchased a VA
     Contract because the Securities Act required Defendants to sell only registered
     securities and Defendants promised to sell only SEC-registered securities as
     documented in the Prospectus[1] and the Annuity Contract. Defendants violated
     that promise; as a result, Plaintiffs lost a substantial portion of their investment.
     A copy of the Annuity Contract is attached as EXHIBIT A.

---

[1] *See* Prudential Premier® Retirement Variable Annuities Prospectus • February 11, 2010
("the Prospectus of the Trust" or "the Prospectus of Advanced Series Trust (AST)").

2. VA contracts are investment contracts; and, therefore, are securities regulated by the U.S. Securities and Exchange Commission ("SEC") pursuant to Sections 2(a)(1), 5(a), and 10(a) of the Securities Act of 1933.

3. Prudential said in the Brochure of The Prudential Insurance Company of America ("PICA") filed with the SEC on 3/30/2012 that "[m]any of our variable insurance and annuity products are supported by investments we hold in various types of registered and unregistered insurance company separate accounts."

4. Prudential (i) invests its private variable insurance trusts ("VITs") in such variable insurance ("VI") and VA products (see ¶3); and (ii) uses the return on equity ("ROE") of such VITs to support its guaranteed retirement pension plan(s) ("VI contracts") pursuant to National Securities Markets Improvement Act ("NSMIA") of 1966.

5. Prudential VI and VA products are underlying private placements of the Prudential Series Fund ("the Fund")[2] in unregistered insurance company separate accounts (see ¶3). Shares in private placements are generally not registered with the SEC during the daily private sales (see ¶42 *infra*).

6. Prudential VA and VI contracts are underlying mutual funds of the Advanced Series Trust ("AST" or "the Trust"), which were documented in the Prospectus of the Trust (see footnote 1), in registered insurance company separate accounts (see ¶3). Such mutual funds are securities registered with the SEC (see ¶2).

7. Prudential, et al. use proprietary trading or covered fund, which is a hedge fund or private equity fund, activities (see Volcker Rule) to transfer VA contract values to VITs (see ¶44.(III)(6) *infra*), which has violated Sec. 13 of the Bank Holding Company Act of 1956 ("BHC Act") (12 U.S. Code ("USC") § 1851).

8. The Prudential's Board ("the Board") (a) promised to deliver an unrealistic target ROE at 12%, on average, to PRU shareholders[3], (b) used the ROE of the VI and

---

[2] *See* the Prudential Series Fund Prospectus • May 1, 2013 ("the Prospectus of the Fund").

[3] The Bloomberg News *Prudential CEO Can Be Rewarded for Missing Target* by Andrew Frye • Mar. 19, 2012 11:00 PM CT • said that "Prudential set an ROE target of 12 percent, on

VA products to support that ROE[4], (c) identified the VA contract values as sources of adequate financial resources available to meet those needs[5], and (d) employed a robust capital protection framework[6], which is a 2-stage embezzlement scheme, to assess capital needs of the VITs arising from market-related distress and use VA contract values as sources of capital available to meet the VITs' needs.

9. During stage 1, Prudential uses a daily auto-rebalancing scheme to steal needed shares of chosen unregistered private placements from each VA contract and transfer them to VITs in order to meet the capital needs of the VITs, i.e., to keep the market capitalization[7] of the VITs consistent with the projected account value of the VITs, on each single business day of the stock market(s).

10. During stage 2, Prudential uses a quarterversary auto-rebalancing scheme, which uses (i) a program rebalance scheme, which unnecessarily transfers a few shares in each of such chosen unregistered private placement(s) between VA contracts and VITs, in order to cover up (ii)(a) the transactions of investing the stolen unregistered private placements (see ¶9) in underlying mutual funds and (b) the processes of registering Prudential as the legal owner of such stolen mutual funds with the SEC.

11. VA individuals lost (i) shares of such unregistered private placements, which are booked in the unregistered insurance company separate accounts, by the end of stage 1 and (ii) shares of such underlying mutual funds, which are booked in

---

average, for the three years through 2014 as the only measure of achievement for Strangfeld and other executives, the Newark, New Jersey- based life insurer said March 16 in a filing."

[4] Prudential (Richard Carbone) said during Prudential Financial (PRU) Q4 2011 Earnings Call • February 9, 2012 • that "the ROEs in these products are supporting that 13% to 14% return."

[5] The Brochure of Prudential Investments LLC ("PI") filed with the SEC on 11/12/2012 said that "[t]he contracts permit allocations of contract values to VITs". See ¶44.(III)(6) infra.

[6] See ¶49.(1) infra.

[7] Market capitalization (or market cap) is the total value of the shares outstanding of a publicly traded company, e.g., PRU; it is equal to the share price times the number of shares outstanding. Market cap of the VITs varies with that of PRU (see ¶44.(I) infra).

the registered insurance company separate accounts, by the end of stage 2 to Prudential if the VITs did not perform as the Board has expected.

12. After the public registration is completed, the next private sales start anew.

13. The Annuity Contract issued by Pruco Life Insurance Company ("Pruco"), a member firm of Prudential, on 4/16/2010 said that:

    a. The Variable Separate Account(s)[8] is registered with the Securities Exchange and Commission ("SEC") under the Investment Company Act of 1940 ("the 1940 Act") as an investment trust, which is a type of investment company. *See* Ex. A, p.8, last para.

    b. [Plaintiffs] may maintain Account Value among a number of Investment Options. The variable Investment Options are the Sub-accounts of the Variable Separate Account(s) shown in the Annuity Schedule. [Plaintiffs] may transfer Account Value between such options. *See* Ex. A, p.8, Sec. ALLOCATION OF ACCOUNT VALUE.

    c. [Pruco] may transfer assets of the Variable Separate Account(s)[] to another Variable Separate Account(s). *See* Ex. A, p.9, last para.

    d. Sub-accounts may invest in underlying mutual funds or portfolios. *See* Ex. A, p.9, 1st para.

Pruco has breached the contract because:

14. Pruco violated its promise in the Annuity Contract that the unregistered insurance company separate accounts of Prudential's VI and VA products (*see* ¶5) are the non-Variable Separate Account(s) ("non-VSA(s)"). *See* ¶13.a.

15. Pruco violated its promise in the Annuity Contract that the variable Investment Options are the Sub-accounts of the non-VSA(s) (*see* ¶14). *See* ¶13.b.

16. Pruco violated its promise in the Annuity Contract when it transferred VA contract values in the variable Investment Options (*see* ¶15), which were Plaintiffs' assets of the non-VSA(s), to VITs (*see* ¶4 and ¶44.(III)⑥ *infra*), which were Prudential's assets of another non-VSA(s)[9], when there were market declines (*see* ¶63.(a) and ¶64 *infra*) during stage 1 (*see* ¶9). *See* ¶13.c.

---

[8] The Annuity Contract, p.5, said that "Variable Separate Account(s): Pruco Life Flexible Premium Variable Annuity Account".

[9] *See* ¶64.(c) *infra*. Another VSA(s) documented in the Annuity Contract shall be deemed to be another non-VSA(s), which is the auto-rebalancing fixed income account(s) of the VITs.

17. Pruco violated its promise in the Annuity Contract when Prudential (i)
    unnecessarily balanced both (a) Plaintiffs' remaining unregistered private
    placements at the end of the stage 1 and (b) its newly added ones, which it stole
    during the stage 1 (*see* ¶10 and ¶45, para. 3 *infra*), in order to generate fake
    quarterly statement(s) (*see* ¶47.(i) *infra*), (ii) invested the stolen assets (*see* ¶16
    and ¶44), which are in the Sub-accounts of the non-VSA(s), in underlying
    mutual funds or portfolios[10] (*see* ¶6), which are in the Sub-accounts of the
    Variable Separate Account(s) ("VSA(s)"), without forwarding such transaction
    confirmations to Plaintiffs (*see* ¶47.(ii) *infra*), and (iii) registered itself as the legal
    owner of such stolen mutual funds without forwarding the certificates to Citi
    Global Markets, Inc., the brokerage firm of Plaintiffs, during stage 2. *See* ¶13.d.

18. Plaintiffs relied on the terms of the agreement set out in the Annuity Contract;
    and their Account/Contract Value was damaged.

19. The fraud is foreseeably related to an injury arising from material
    misrepresentation or omission in connection with the offer and the sale of such
    VA (*see* Rule 10b-5); and the use of a manipulative device or contrivance,
    and/or a manipulation of the price (*see* 7 USC § 25) of the contract during the
    operations of the VA business, which are not merely incidental to the fraud.

## II. JURISDICTION, VENUE, AND STATUTE OF LIMITATIONS

20. The court has jurisdiction over this action pursuant to the Common Law; Section
    22 of the Securities Act of 1933 [15 USC § 77v], Section 27 of the Exchange Act
    of 1934 [15 USC § 78aa], Section 44 of the Investment Company Act of 1940
    [15 USC § 80a-44], and Section 214 of the Investment Advisers Act of 1940 [15
    USC § 80b-14]; and 7 USC § 25.

21. Venue is proper in this Court pursuant to the Common Law; Section 22 of the
    Securities Act [15 USC § 77v], Section 27 of the Exchange Act [15 USC § 78aa],
    Section 44 of the Investment Company Act [15 USC § 80a-44], and Section 214
    of the Investment Advisers Act [15 USC § 80b-14]; and 7 USC § 25 because
    Plaintiffs and certain of Defendants may be found in and are inhabitants within

---

[10] *See* ¶69 *infra*. The Trust is not available for direct investment by VA individuals.

the Northern District of Illinois; and certain of the acts, practices and courses of business alleged herein occurred within the Northern District of Illinois.

22.  The securities fraud lawsuit is filed within the statute of limitations pursuant to the Common Law, *28* USC § 1658(b), and F.R.C.P. Rule 60(b).

## III. THE PARTIES

23.  The Plaintiffs, Michael H. Wu and Christine T. Wu ("Wu"), are individuals who are citizens of United States of America ("USA") and reside within this District.

24.  The Defendant, Prudential Financial, Inc. ("PFI"), is located in Newark NJ, USA and is the owner of Prudential Annuities business.

25.  The Defendant, John Robert Strangfeld Jr. ("Strangfeld"), is located in Newark, NJ, USA; the Chairman of the Board; and the CEO and the President of PFI and PICA.

26.  The Defendant, Mark Brown Grier ("Grier"), is located in Newark, NJ, USA and the vice Chairman of the Board.

27.  The Defendant, Richard J. Carbone ("Carbone"), is located in Newark, NJ, USA and the (ex) CFO of PFI and PICA; and might be a member of the Board.

28.  The Defendant, Pruco Life Insurance Company ("Pruco"), is located in Newark NJ, USA and the issuer of the Annuity Contract(s).

29.  The Defendant, Citigroup Global Markets, Inc. ("CGMI") who is also known as Citi Personal Wealth Management ("CPWM"), is located in New York City, NY, USA; an Investment Advisor ("IA") firm; and a brokerage firm.

30.  The Defendant, John P. Havens ("Havens"), is located in New York, NY, USA and was the CEO of CGMI.

31.  The Defendant, LSV Asset Management ("LSV"), is located in Chicago, IL, USA, an investment manager ("IM") of Investment Option(s) in Private Investment(s) in Public Equity ("PIPE") of the Fund, a portfolio manager ("PM"), and also a contractual intermediary of portfolio(s) in PIPE(s) of the Trust.

32.  The Defendant, Marsico Capital Management LLC ("Marsico"), is located in Denver, CO, USA, an IM of Investment Option(s) in PIPE(s) of the Fund, a PM, and also a contractual intermediary of portfolio(s) in PIPE(s) of the Trust.

33. The Defendant, T. Rowe Price Associates, Inc. ("TRPA"), is located in Baltimore, MD, USA, an IM of Investment Option(s) in PIPE(s) of the Fund, a PM, and also a contractual intermediary of portfolio(s) in PIPE(s) of the Trust.

34. The Defendant, William Blair & Company LLC ("WBC"), is located in Chicago, IL, USA, an IM of Investment Option(s) in PIPE(s) of the Fund, a PM, and also a contractual intermediary of portfolio(s) in PIPE(s) of the Trust.

## IV. FACTS

### Misconducts et al of CGMI and Havens

35. Plaintiffs are long-time customers of Citibank. They visited its branch office in Naperville, IL and told a cashier on 3/29/2010 that they wanted to invest their savings to make more money than interest paid by certificate of deposit ("CD") when their CD would mature on 4/13/2010. The cashier told Plaintiffs that CPWM (Xiao-mei Linda Wang ("Wang")) could help. Plaintiffs walked to and told Wang that Plaintiffs' primary investment objective is growth on 3/29/2010.

36. CGMI (Wang) recommended the Pruco Annuity Contract on 3/29/2010 without following National Association of Securities Dealers ("NASD") conduct rules[11]: she (a) did not have a thorough knowledge of the specifications of the Contract; (b) did not gave Plaintiffs a copy of the summary and the present prospectus; (c) did not give a copy of any Brochure filed with the SEC (see 17 CFR 275.204-3); (d) did not take age into consideration; (e) used three sample VA transcripts, which were not approved by a registered principal of CGMI, and a copy of Pruco Sales Material to misrepresent that the Annuity Contract had a minimum 6% growth rate annually and the charges of "benefit fee" were for that guaranteed 6% growth; (f) opened a CGMI broker-dealer account; and (e) filled out a Prudential Premier Retirement Variable Annuity Application Form ("VA Application Form") with only one chosen Investment Option, i.e., AST

---

[11] See NASD Notices to Members 96-86, 99-35, and 04-45; and Rule 2310 (Suitability Rule). In 2007, the NASD merged with the New York Stock Exchange's regulation committees to form the Financial Industry Regulatory Authority ("FINRA").

Preservation Asset Allocation Portfolio, for Plaintiffs without forwarding it to a registered principal within CGMI for suitability review.

37. Plaintiffs gave the VA Application Form back to CGMI (Wang) on 4/13/2010 to order shares of AST Preservation Asset Allocation Portfolio, which shall be deemed to be the underlying AST mutual fund of the VSA(s) (see ¶13.a) pursuant to Regulation D of the Securities Act of 1933.

38. CGMI put shares of underlying unregistered private placement, which was the underlying Investment Option of the non-VSA (see ¶42), in Plaintiffs' account, without the knowledge and agreements when the Pruco Annuity Contract[12] was issued on 4/16/2010.

39. CGMI never forwarded dividends or distributions to Plaintiffs since 4/16/2010, which has violated COUNT 11.

40. CGMI surrendered its fiduciary duty to Prudential (see ¶44.(III)④ *infra*), which willfully aids and abets the commission of the violation of 7 USC § 25; and also has violated COUNTs 2-10 and 12-15.

41. Havens knew or recklessly disregarded the facts that (i) CGMI may surrender its fiduciary duty and (ii) CGMI, et al., may receive greater compensation in return when CGMI signed the participating agreement of selling such Pruco Annuity Contract(s), which willfully aids and abets the commission of the violation of 7 USC § 25; and also has violated COUNTs 2-7 and 9-14.[13]

## The Use of a Manipulative Device or Contrivance

42. Private Investment in Public Equity ("PIPE") is a manipulative device or contrivance because Prudential differentiates neither the name nor the net asset value ("NAV") between (i) Investment Option(s) of the non-VSA(s), which is unregistered private placement(s), and (ii) corresponding mutual fund(s) or portfolio(s) of the VSA(s), which has violated 7 USC § 25 and COUNT 3. A copy of the page, which documents PIPEs, is attached as Ex. B-1 under EXHIBIT B.

---

[12] Pruco Annuity Contract is an investment contract, which shall be deemed to be a security pursuant to Sec. 2(a)(1) of the Securities Act of 1933.

[13] *See* NASD Rule 3010 and the Prospectus of the Trust, p.98, para.1.

43. Prudential (Brooke Davis) said in its letter dated 12/8/2011 to Plaintiff(s) that it uses two auto-rebalancing schemes, i.e., the daily and the quarterversary auto-rebalancing schemes (*see* ¶9 and ¶10), to manage the Guarantee of VA Contracts. A copy of said Prudential letter, which disclosed the 2-stage scheme, and the Pruco Sales Material, which highlights how Prudential (Pruco) manages the Guarantee of VA Contracts, is attached as Exs. B-2a and B-2b respectively under EXHIBIT B. They are schemes because:

44. Prudential uses the daily auto-rebalancing scheme to steal needed unregistered private placements during stage 1 (*see* ¶9): (I) *Prudential News* by Darrell Oliver (*see* Ex. B-3) said that "Prudential Investments [LLC ("PI")] is the mutual fund family of Prudential Financial, Inc. (NYSE: PRU) and offers funds across a range of asset classes and sectors, including equity, fixed income, real estate and specialty securities[]"; (II) the Board said in the Prospectus of the Fund (*see* Ex. B-4) that "PI can change allocations [among the subadvisers] without prior notice and without board or shareholder approval[]"; (III) PI said in the PI Brochure filed with the SEC on 11/12/2012 (*see* Ex. B-5) that ① Pruco, the owner of group VA contract(s), entered into participation agreements with the VITs in order to receive research services from PI (*see* Ex. B-5, p.8); ② PI daily monitors fund performance and market cap consistency of the VITs, which can be done only after PI has calculated the NAVs of underlying mutual funds, usually as of the close of the trading at 4:00 p.m. (ET) (*see* Ex. B-5, p.8); ③ PI prepares proprietary reports (*see* Ex. B-5, p.2), which are Prudential's allocation orders used to transfer Plaintiffs' contract value, through unregistered private placements, to VITs[14] without being entered into the order routing and execution systems (*see* 17 CFR 242.605 and 17 CFR 242.606); ④ Pruco and Prudential Investment Management Services LLC ("PIMS"), acting as the broker-dealers in the capacity of principal or agent[15] on both sides of the

[14] Plaintiffs purchased mutual funds but Prudential gave Plaintiffs unregistered private placements when the Annuity Contract was issued. Prudential transfers Plaintiffs' private placements to VITs and Prudential's "junk bonds" to Plaintiffs simultaneously thereafter.
[15] CGMI is Pruco's agent. CGMI surrendered its fiduciary duty to Pruco. *See* ¶40.

transactions (*see* Ex. B-5, p.13), (a) receive such allocation orders from PI far after the close of the trading that day but (b) allow Prudential to receive the price based on the prior NAV(s) already determined by PI as of that day; ⑤ other PI affiliates pretend to conduct compliance functions (*see* Ex. B-5, p.14) pursuant to *Rule 22c-1* and order executions (*see* Ex.B-5, p.12) of such allocation orders; ⑥ underlying portfolio managers move Plaintiffs' contract value to VITs based on what Pruco has told them (*see* Ex. B-5, pp.4 and 8); and ⑦ PI charges the covered fund extreme high mismanagement fees (*see* Ex. B-5, p.9, e.g.) for its operating said 2-stage embezzlement scheme; and (IV) Prudential (Prudential Annuities) generates fake transaction confirmations and mails them to Plaintiffs on the next business day (*see* ¶46 *infra* and Ex. B-6) without providing particular information pursuant to Rule 10b-10 (17 CFR 240.10b-10), which has violated 7 USC § 25; and COUNTs 2-5, 7-8, 10, and 12-15. A copy of (a) the *Prudential News* (Ex. B-3), (b) what the Board said (Ex. B-4), (c) what the PI Brochure said (Ex. B-5), and (d) what Prudential told Plaintiff(s) on 5/14/2012 (Ex. B-6) is added to EXHIBIT B.

For better explaining the daily auto-rebalancing scheme, what Prudential says and does are summarized in Ex. B-7a and EX. B-7b respectively. A copy of Ex. B-7a and Ex. B-7b is appended to EXHIBIT B.

As shown in Ex. B-7a, during stage 1, Prudential has accumulatively transferred (i) needed contract value $Y(i)$ from Your Chosen Investment Option(i) to Bond Portfolio and (ii) overinflated non-contract value $Y(i)$ from Bond Portfolio to Your Chosen Investment Option(i), e.g., where 'i' in '(i)' is the i-th chosen Investment Option.

As shown in Ex. B-7b, Plaintiffs had $X(i)+Y(i)$ shares of Your Chosen Investment Option(i) when underlying daily private sales began but had $X(i)$ shares left when the daily private sales ended. Prudential used the daily

auto-rebalancing scheme to smartly transfer $Y(i)$ shares to VITs during stage 1.

Bond Portfolio under Plaintiffs' VA contract shall be and can be ignored.[16] And:

45. Prudential uses the quarterversary auto-rebalancing scheme to balance the numbers of shares between (a) what are booked in the Sub-accounts of the non-VSA(s) for unregistered private placements, which are updated during stage 1, and (b) what are booked in that of the VSA(s) for underlying mutual funds, which are updated during stage 2, rather than to merely transfer a few shares of such unregistered private placements between Prudential and Plaintiffs, which has violated 7 USC § 25 and COUNTs 2-5, 7, 9-10, and 13-15.

For better explaining the quarterversary auto-rebalancing scheme, what Prudential says and does are summarized in Ex. B-8a and EX. B-8b respectively. A copy of Ex. B-8a and Ex. B-8b is appended to EXHIBIT B.

As shown in Ex. B-8a, e.g., Prudential told Plaintiffs that the number of shares of Investment Option(i) in VA contract was changed from $X(i)$ to $X'(i)$ but did not tell Plaintiffs that $Y(i)$ in VITs was changed to $Y'(i)$ simultaneously because the total number of shares in $X(i)+Y(i)$ must equal to that in $X'(i)+Y'(i)$.

As shown in Ex. B-8b, the quarterversary auto-rebalancing scheme also invested Investment Option(i) in underlying mutual fund(i)[17] and registered such mutual fund(i) with the SEC[18]. The number of shares of mutual fund(i) booked in the Sub-account of the VSA(i) was updated after Prudential invested Investment

---

[16] Bond Portfolio, which is not a PIPE, is a fixed-income portfolio of "junk bonds". The value in Bond Portfolio is not part of Plaintiffs' VA contract value (*see* ¶44.(III)⑥). The Prospectus of the Trust said that Plaintiffs are not allowed to get rid of such "junk bonds" in Bond Portfolio.

[17] Prudential (Christopher Hagan) said is his letter dated 3/20/2012 to Plaintiff(s) that "Prudential variable annuity products are not mutual funds, but rather are annuity products that invest in mutual funds."

[18] Prudential said in Ex. B-1 that "[u]ntil the public registration process is completed, PIPEs are restricted as to resale and the Fund cannot freely trade the securities."

Option(i) in mutual fund(i) and that filed with the SEC was updated after the quarterversary public registration process was completed.[19]

46.    Transaction conformation(s), which Prudential (Prudential Annuities) generated and mailed to Plaintiffs (see Ex. C-1, e.g.), is a manipulative device or contrivance because (i) ) it did not tell Plaintiffs (a) when the transaction request was received, (b) the role of the broker-dealer(s), (c) who was the buyer of underlying unregistered private placements, and (d) who was the seller of underlying "junk bonds", et al. pursuant to Rule 10b-10 (17 CFR §240.10b-10); and (ii) Plaintiffs had asked Prudential to provide such particular information twice via e-mails dated 7/16/2012 (see Ex. C-2) and 2/13/2014 (see Ex. C-3) respectively, which Prudential declined. A copy of the sample transaction confirmation (Ex. C-1) and the two request e-mails (Exs. C-2 and C-3) is attached under EXHIBIT C.

47.    Quarterly statement(s), which Prudential (Prudential Annuities) generated and mailed to Plaintiffs (see Exs. C-4 and C-5, e.g.), is a manipulative device or contrivance because (i) all transactions documented in the statement(s) were allocations of the covered fund (see ¶7), which are unregistered funds (including hedge funds)[20], and/or "junk bonds"; and (ii) the transactions of investing such stolen unregistered private placements in underlying mutual funds (see ¶13.d) were not included in the statement(s)[21]. A copy of the 3Q2011 and the 4Q2011 statements (Exs. C-4 and C-5 respectively) is attached as under EXHIBIT C.

---

[19] Not only Prudential's broker-dealer but also underlying Mutual Fund Company's need to publicize how customer orders were routed for execution in their respectively quarterly reports. See Rule 606 of SEC Regulation National Market System ("NMS").

[20] The Brochure of Prudential Investment Management, Inc. ("PIM") filed with SEC on 3/30/2012 said that "PIM's portfolio managers are often responsible for managing multiple accounts, including ... various pooled investment vehicles, such as unregistered funds (including hedge funds)."

[21] Only the transactions of investing unregistered private placements in underlying mutual funds during the public registrations has been entered into the order routing and execution systems but Prudential has never forwarded such transaction confirmations to Plaintiffs.

As shown in Exs. C-4 and C-5, Program Rebalance transferred a few shares of underlying unregistered private placements between VITs and Plaintiffs' VA contract on 7/18/2011 and 10/17/2011 respectively, which not only had no impact to Plaintiffs' contract value but also had nothing to do with investing such stolen unregistered private placements in underlying mutual funds.

Ex. C-6 summarizes the two Program Rebalances and the 17 Benefit Fund Transfers done in 2H2011. A copy of Ex. C-6 is attached under EXHIBIT C.

As shown in Ex. C-6, Prudential conducted 12 Benefit Fund Transfers during stage 1 between underlying two consecutive quarterversary public registrations to accumulatively transfer US\$45,515 from Plaintiffs' contract to VITs. Prudential invested said US\$45,515 in underlying mutual funds during stage 2 on or around 10/17/2011 but did not document such transactions of investments in Ex. C-5.

### A Manipulation of the Price of the Pruco Annuity Contract

48. AST Investment Grade Bond Portfolio ("Bond Portfolio") is used to manipulate the price of the Annuity Contract because (a) it is not a registered AST mutual fund or portfolio of the VSA(s), (b) it is the guaranteed lifetime income insurance product called Prudential IncomeFlex® Target (SM)[22] of the non-VSA(s), (c) it is a fixed-income portfolio of overinflated "junk bonds", which are non-investment grade bonds (see footnote 16), (d) Prudential never publishes its NAV under the Prudential Annuities' website, (e) its NAV is manipulated by PI (see ¶44.(l)), and (f) it is transferred by using the daily auto-rebalancing scheme without Plaintiffs' authorization (see ¶44.(III)④).

### The Robust Capital Protection Framework Is a 2-stage Embezzlement Scheme

49. Strangfeld said in 2011 PFI Annual Report that ① "we employ a robust capital protection framework to ensure availability of adequate capital under reasonably foreseeable stress scenarios. This framework is used to assess potential capital needs arising from market-related distress and identify sources of capital

---

See Prudential letter dated 6/4/2009 at http://www.dol.gov/ebsa/pdf/cmt-06050909.pdf. Prudential (Christine Marcks) said in her "Request to Testify" letter that "Prudential offers institutionally priced target date funds[, which are the overinflated "junk bonds",] designed to support its guaranteed lifetime income insurance product[.]"

available to meet those needs[ (*see* ¶8)]", ② "[i]n 2011, Prudential completed four pension risk transfer transactions, including its first longevity reinsurance transaction and the U.S.'s first pension plan risk transfer transaction utilizing a buy-in of a specially designed annuity product[ (*see* ¶¶16 and 42-48)]", and ③ "[o]ur capital deployment strategy has also included share buybacks. Under an authorization by Prudential's Board of Directors issued in June 2011 to repurchase at management's discretion up to $1.5 billion of the company's outstanding Common Stock through June 2012, the company acquired 19.8 million shares of its Common Stock at a total cost of approximately $1.0 billion, representing the repurchases made during the second half of 2011[ (*see* ¶17)]". As a result, PFI, Strangfeld, Grier, and Carbone has violated 7 USC § 25; and COUNTs 2-14. A copy of the page, which documented what Strangfeld said, is attached as EXHIBIT D.

**Rule 10b-5: Material Misrepresentation or Omission**

50. Pruco did not mention in the Annuity Contract that Pruco may sell unregistered private placements, which are not the securities of the VSA(s) (*see* ¶1 and ¶13.a), to Plaintiffs when the Annuity Contract was issued.

51. Pruco did not mention in the Annuity Contract that (i) Plaintiffs may transfer Plaintiffs' Account Value between such options of the non-VSA(s), through the transfers of underlying unregistered private placements between Plaintiffs' Annuity Contract and VITs, during daily private sales; and (ii) Prudential may also do that during quarterversary public registrations (*see* Ex. C-4). *See* ¶13.b.

52. Pruco did not mention in the Annuity Contract that Prudential may transfer the Contract Value in Plaintiffs' Sub-accounts of the non-VSA(s) to Prudential's Sub-accounts of another non-VSA(s) during daily private sales. *See* ¶13.c.

53. Pruco did not mention in the Annuity Contract that Prudential may (i) invest such stolen Contract Value, which was transferred from Plaintiffs' Sub-account(s) to Prudential' Sub-account(s) (*see* ¶52), in underlying mutual funds or portfolios of

the VSA(s) and (ii) register itself as the legal owner of such stolen mutual funds or portfolios during quarterversary public registrations.[23] *See* ¶13.d.

**Rule 10b-5: Scienter**

54.   Pruco knew or recklessly disregarded the fact that it is illegal to sell either (i) VI and VA products (*see* ¶5), which are the various Investment Options of the non-VSA(s) rather than the underlying mutual funds of the VSA(s) (*see* ¶50), to Plaintiffs when the Annuity Contract was issued (*see* ¶38) and during daily private sales thereafter (*see* ¶44); or (ii) AST Investment Grade Bond Portfolio, which is neither a portfolio of the VSA(s) nor a portfolio of the non-VSA(s), to Plaintiffs during daily private sales thereafter (*see* ¶48).

55.   Pruco knew or recklessly disregarded the fact that PIPE(s) (*see* ¶42), which can be not only the Investment Option(s) of the non-VSA(s) (*see* ¶13.b and ¶15) but also the mutual fund(s) or the portfolio(s) of the VSA(s) (*see* ¶13.d and ¶17), is the specially designed annuity product(s) (*see* ¶49.②), which enables Prudential to (A) sell unregistered private placements when the Annuity Contract was signed (*see* ¶38); and (B) steal (i) needed shares of such unregistered private placements during daily private sales (*see* ¶44) and (ii) underlying mutual funds during quarterversary public registrations (*see* ¶45) thereafter without being regulated by the SEC (*see* ¶2). As a result, Pruco has violated 7 USC § 25 and COUNTs 1-15.

**Rule 10b-5: Reliance upon the Misrepresentation or Omission**

56.   Defendants intended that Plaintiffs would rely on the terms of the agreement set out in the Annuity Contract and Plaintiffs did so rely on those terms. As a result, Plaintiffs' contract assets were injured due to (i) the misrepresentation or omission (*see* ¶¶50-53) and (ii) the scienter (*see* ¶¶54-55).

**Rule 10b-5: In Connection with the Purchase or Sale of Securities**

---

[23]   Prudential did neither (i) send the transaction confirmations to Plaintiffs nor (ii) forward the certificates of such mutual funds to CGMI.

57. Section 5(a) of the Securities Act said that "[u]nless a registration statement is in effect as to a security, it shall be unlawful [] to sell such securities through the use [] of any prospectus".

58. Section 10(a) of the Securities Act said that "(1) a prospectus relating to a security [] shall contain the information contained in the registration statement".

59. The Prospectus of the Trust said that "[e]ach underlying mutual fund is registered as an open-end management investment company under the Investment Company Act [of 1940]."

60. Plaintiffs applied for "AST Preservation Asset Allocation Portfolio" on 4/13/2010 because it shall be deemed to be an underlying mutual fund of the Trust.

61. Plaintiffs did not cancel the Annuity Contract dated 4/16/2010 within the 10 days of RIGHT TO CANCELL because it said that "[t]he Variable Separate Account(s) is registered with the [SEC] under the Investment Company Act of 1940 [] as a unit investment trust, which is a type of investment company."

### Rule 10b-5: Loss Causation

62. Prudential used (A) the authorizations from the Board and CGMI, the proprietary reports from PI, and the daily auto-rebalancing scheme to repeatedly transfer (i) more weighted shares of chosen unregistered private placements from Plaintiffs' VA contract to VITs when there were market declines and (ii) less weighted shares of that from VITs back to Plaintiffs' VA contract when there were market raises during stage 1 (see ¶44); and (B) the quarterversary auto-rebalancing scheme to (i) rebalance the stolen assets among chosen unregistered private placements, (ii) invest such balanced chosen unregistered private placements in underlying mutual funds, and (iii) register itself as the legal owner of such stolen mutual funds during stage 2 (see ¶45); because

63. Grier said during *Prudential Financial Inc. (PRU) Q4 2009 Earnings Call February 11, 2010* that (a) "[t]hese products include an auto rebalancing feature that shifts customer funds to fixed income investments to protect account values and support our guarantees in market downturns[]" and (b) "[t]he auto rebalancing algorithm is functioning as intended, returning customer funds to

participate in market appreciation as account values become adequate to support our guarantees[ in market upturns]." A copy of the page, which documented what Grier said, is attached as Ex. E-1 under **EXHIBIT E**. And:

64.   Grier said during *Prudential Financial Inc. (PRU) Q4 2010 Earnings Call February 10, 2011* that (a) "[a]ll of the variable annuity living benefit features we offer today come packaged with an auto-rebalancing feature, where customer funds are reallocated to fixed income investments to support our guarantees in the event of market declines[,]" (b) "[o]ur auto-rebalancing algorithm has functioned well, producing net transfers of about $7 billion from auto-rebalanced fixed income investments to funds that clients have selected since the market trough in early 2009[,]" and (c) "[a]t the trough of the market, more than ¾ of the account values were in auto-rebalance fixed income accounts[]", which has violated 7 USC § 25 and COUNT 10 because Prudential may invest such stolen VA contract values to acquire a large ownership stake in PRU (*see* ¶44.(l)). A copy of the page, which documented what Grier said, is attached as Ex. E-2 under EXHIBIT E. And:

65.   The Board used such disgorgements (*see* ¶49) for personal uses. A copy of 2011 pensions, e.g., which the Board set to compensate Strangfeld, Grier, and Carbone, et al. for their recklessness, is attached as Exs. E-3a, E-3b, and E-3c respectively under EXHIBIT E. And:

66.   Prudential pocketed all the dividends, which underlying mutual fund companies distributed, because it sold Plaintiffs unregistered private placements and "junk bonds" exclusively rather than underlying mutual funds (*see* ¶1); and, therefore, Plaintiffs could not get such dividends, which has violated 7 USC § 25 and COUNT 11. A copy of what Carbone said on 2/10/2011 and 2/9/2012, e.g., is attached as Exc. E-4a and E-4b respectively under EXHIBIT E.

### Rule 10b-5: Economic Loss

67.   The economic loss as of 3/2/2015 (ps. the peak of the latest market segment before this filing) was estimated to be $87,064 (= $185,360 – $110,096 + $11,800), which was calculated by using the specific performance method

based on the performance of the S&P 500 Index[24] because Prudential Annuity Contract is rare and/or unique, and damages would not suffice to place Plaintiffs in as good a position as they would have been had the breach not occurred: (A) the contract value should be $185,360 as of 3/2/2015 because (i) the contract value was $110,096 on 12/31/2010, (ii) the S&P 500 Index was 1,257.64 on 12/31/2010, and (iii) the S&P 500 Index was 2,117.39 on 3/2/2015; and (B) the loss of dividends and/or distributions was around $11,800 as of 3/13/2015 because (i) the S&P 500 companies paid 2.09% annually, on average, and (ii) NAV of a stock would drop the same amount of dividends paid on the distribution day. A copy of the quarterly statement, which documents that the contract value was $110,096, is attached as Ex. E-5 under **EXHIBIT E**.

**Misconducts of Underlying Four Unaffiliated Portfolio Managers**

68. Prudential said in the PI Brochure filed with the SEC on 11/12/2012 that (a) "[t]he manager evaluation process is a rigorous approach that captures both qualitative and quantitative attributes using screening techniques, questionnaires and analytical assessments, interviews, on-site visits at PI's discretion, and on-going monitoring of portfolio performance and holdings[]" (see Ex. B-5, p.2, Sec. A.1. para. 2, the 2nd sentence); and (b) "... the individual portfolio manager who is primarily responsible for the day-to-day management of a portfolio or fund moves from one firm to another firm ..." (see Ex. B-5, p.4, Sec. Manager Termination or Addition, para. 2 and ¶44.(III)⑥).

69. Lord, Abbett & Co. LLC, acting as sub-advisor to PI with regard to the AST Lord Abbett Core Fixed-Income Portfolio, which is an investment portfolio of the Trust, said in its e-mail dated 6/11/2012 to Plaintiff(s) that "[t]he Trust is an investment vehicle for life insurance companies writing variable annuity contracts and variable life insurance policies as well as to certain tax-deferred retirement plans and is not available for direct investment by individuals. Lord

---

[24] Prudential said in the Prospectus of the Fund that "[t]o achieve our objective, we use the performance of the Standard & Poor's 500 Composite Stock Price Index (S&P 500 Index)."

Abbett is not the investment manager of the Portfolio or the Trust." A copy of the e-mail is attached as Ex. F-1 under EXHIBIT F.

70. Eagle Fund Service, who is not a portfolio manager ("PM") of the Trust but acts as a sub-advisor to PI, said in its e-mail dated 6/5/2012 to Plaintiff(s) that (i) "[w]e have investigated your concerns over the past two weeks to ensure that our industry partners are trading in an appropriate manner[25] and to confirm that we are adhering to our internal procedures [,]" (ii) "Prudential has a sales agreement with the Eagle Family of Funds to offer our funds on their platform, along with other funds, in an omnibus arrangement [,]" and (iii) "[a]s part of our investigation into your concerns, we have confirmed that the Eagle Family of Funds is in compliance with SEC Rule 22c-2, which dictates a fund company's responsibility to contract with intermediaries for the purpose of detecting potential market timing activities." A copy of the e-mail is attachment as Ex. F-2 under EXHIBIT F.

71. Marsico said in its e-mail dated 5/2/2012 to Plaintiff(s) that "… We are not able to comment on Marsico Products offered by different entities such as Prudential." A copy of the e-mail is attachment as Ex. F-3 under EXHIBIT F.

72. LSV, Marsico, TRPA, and WBC, who offer their respective product(s) in the portfolio(s) and also act as the IM of such portfolio(s), knew or should have known that they willingly aid, abet, induce, or procure the commission of a violation of 7 USC § 25 and COUNTs 2, 5- 7, 9-10, and 12-14 because they are sub-advisers or contracted intermediaries to PI to administer certain compliance functions for those portfolio assets that are directly managed by them.

## V. COUNTS

### COUNT 1 - Violations of the Common Law

73. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

74. Pruco has breached the Annuity Contract.

---

[25] This happened because the transactions done by the daily auto-rebalancing scheme are in-house asset transfers between Prudential and VA individuals without being entered into the order routing and execution systems. *See* the Exchange Act Rules 605 and 606.

75. By reason of the foregoing, Defendant mentioned in paragraph 74 has violated and, unless enjoined, will again violate the Common Law.

**COUNT 2 - Violations of Sections 5(a), 5(b), and 5(c) of the Securities Act**

76. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

77. All Defendants, singly or in concert, directly or indirectly, sold unregistered private placements to non-accredited investors (or other purchases) without informing them that they received "restricted" securities, neither meeting the requirement of Sections 3(b) or 4(a)(2) nor following the *Rules 504, 505, and 506* set out under Regulation D of the Securities Act of 1933.

78. By reason of the foregoing, Defendants mentioned in paragraph 77, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25; and Sections 5(a), 5(b), and 5(c) of the Securities Act [15 USC § 77e(a), 77e(b), and 77e(c)].

**COUNT 3 - Violations of Section 12(a) of the Securities Act**

79. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

80. PFI, Strangfeld, Grier, Carbone, Pruco, CGMI, and Havens, singly or in concert, directly or indirectly, made an untrue statement of material fact or omitted to state a material fact required to make the statements therein no misleading in the registration statement of underlying variable Investment Options and Bond Portfolio in sales materials, the application form, the prospectus, transaction confirmations, statements, reports, news, Brochures, and/or contracts.

81. By reason of the foregoing, Defendants mentioned in paragraph 80, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25 and Section 12(a) of the Securities Act [15 USC § 77l(a)].

**COUNT 4 – Violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act; and Section 34(b) of the Investment Company Act**

82. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

83. PFI, Strangfeld, Grier, Carbone, Pruco, CGMI, and Havens,, directly or indirectly, singly or in concert, in the offer and sales of Prudential VAs, which are securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, have (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchase of securities.

84. By reason of the foregoing, Defendants mentioned in paragraph 83, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25; and Sections 17(a)(1), 17(a)(2), and 17(a)(3) of Securities Act [15 USC § 77q(a)(1), 77q(a)(2), and 77q(a)(3)]; and Section 34(b) of the Investment Company Act [15 USC § 80a-34(b)].

## COUNT 5 – Violations of Section 5 of the Securities Exchange Act

85. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

86. All Defendants, singly or in concert, directly or indirectly, engage in transactions, practices, or courses of executing "Benefit Fund Transfer" transactions on Unregistered Exchanges and the volume of underlying transactions is too big to be traded on Unregistered Exchanges.

87. By reason of the foregoing, Defendants mentioned in paragraph 86, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25 and Section 5 of the Exchange Act [15 USC § 78e].

## COUNT 6 - Violations of Sections 9(a), 9(b), and 9(j) of the Securities Exchange Act

88. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

89. All Defendants, singly or in concert, directly or indirectly, engage in acts, practices, or courses of manipulation of security prices.

90. By reason of the foregoing, Defendants mentioned in paragraph 89, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25; and Sections 9(a), 9(b), and 9(j) of the Securities Exchange Act [15 USC § 78i(a), 78i(b) and 78i(j)].

## COUNT 7 – Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder

91. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

92. All Defendants, directly or indirectly, singly or in concert, use proprietary trading or covered fund, "junk bonds", nonpublic proprietary reports, unauthorized broker-dealers, non-contractual compliance reviewers, underlying portfolio managers, and unregistered exchanges to conduct in-house asset transfers between Plaintiffs VA contract and Prudential, which is prohibited. *See Section 204A* of the Advisers Act.

93. By reason of the foregoing, Defendants mentioned in paragraph 92, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25; and Section 10(b) of the Securities Exchange Act [15 USC § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## COUNT 8 – Violations of Rules 10b-10(a), 10b-10(a)(1), 10b-10(a)(2), and 10b-10(a)(2)(i)(A) under Section 10b of the Securities Exchange Act; and Sections 206(1), 206(2), and 206(3) of the Investment Advisers Act

94. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

95. PFI, Strangfeld, Grier, Carbone, Pruco, CGMI, and Havens,, singly or in concert, directly or indirectly, did not give or send VA individuals trade confirmation at or before completion of such transaction; and did not disclose to VA individuals the time of the transactions, the role of the broker or dealer, and the name of the person from whom the security was purchased, or to whom it was sold, for VA individuals.

96. By reason of the foregoing, Defendants mentioned in paragraph 95, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25; SEC Rules 10b-10(a), 10b-10(a)(1), 10b-10(a)(2), and 10b-10(a)(2)(i)(A) [17 C.F.R. § 240.10b-10(a),10b-10(a)(1), 10b-10(a)(2), and 10b-10(a)(2)(i)(A)] under Section 10b of the Securities Exchange Act [15 USC § 78j(b)]; and Sections 206(1), 206(2), and 206(3) of the Investment Advisers Act [15 USC § 80b-6(1), 80b-6(2), and 80b-6(3)].

## COUNT 9 –Violations of Sections 13(b)(2)(A) and 13(b)(5) of the Securities Exchange Act; and Rules 13b2-1 and 13b2-2 thereunder

97. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

98. All Defendants, singly or in concert, directly or indirectly, knowingly circumvented or knowingly failed to implement a system of internal accounting controls, or knowingly falsified the books, records, and accounts of their respective companies, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

99. By reason of the foregoing, Defendants mentioned in paragraphs 98, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25; and Sections 13(b)(2)(A) and 13(b)(5) of the Exchange Act [15 USC § 78m(b)(2)(A) and 78m(b)(5)] and Exchange Rules 13b2-1 and 13b2-2 [17 C.F.R. § 240.13b2-1, 240.13b2-2] thereunder.

## COUNT 10 – Violations of Sections 12(d)(1)(A) and 12(d)(1)(B) of the Investment Company Act

100. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

101. All Defendants, singly or in concert, directly or indirectly, use(d) the robust capital protection scheme, et al., which are/were not prescribed as necessary or appropriate in the public interest or for the protection of VA investors.

102. By reason of the foregoing, Defendants mentioned in paragraph 101, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again

violate 7 USC § 25; and Sections 12(d)(1)(A) and 12(d)(1)(B) of the Investment
Company Act [15 USC § 80a-12(d)(1)(A) and 12(d)(1)(B)].

### COUNT 11 – Violations of Section 19(a) of the Investment Company Act

103. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if
fully set forth herein.

104. PFI, Strangfeld, Grier, Carbone, Pruco, CGMI, and Havens, singly or in concert,
directly or indirectly, forwarded all dividends and/or distributions in the nature of
dividends, which underlying Mutual Fund Companies of the Trust paid to all
clients including VA individuals, to PFI without being accompanied by written
statements which adequately disclose the source or sources of such payments.

105. By reason of the foregoing, Defendant mentioned in paragraph 104 has violated
and, unless enjoined, will again violate 7 USC § 25 and Section 19(a) of the
Investment Company Act [15 USC § 80a-19(a)].

### COUNT 12 – Violations of Section 22(c) of the Investment Company Act; and Rules 22c-1 and 22c-2 Thereunder

106. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if
fully set forth herein.

107. All Defendants, singly or in concert, directly or indirectly, did not have in place
procedures that segregate investor and Prudential's orders received before the
fund prices its shares (which will receive that day's price) from those that were
received after the fund prices its shares (which will receive the following day's
price); did not have contractual provisions with transfer agents and other
intermediaries that obligate those parties to segregate orders received by time
of receipt in order to prevent "late trading" based on a previously determined
price, and did not take affirmative steps to protect themselves and their
shareholders against "late trading" by obtaining assurances that those policies
and procedures of SEC Rule 22c-1 are/were effectively administered; and
willingly and egregiously engaged in the course of "market timing" practices
during daily in-house "Benefit Fund Transfer" transactions.

108. By reason of the foregoing, Defendants mentioned in paragraph 107, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25; and Sections 22(c) of the Investment Company Act [15 USC § 80a-22(c)] and Rules 22c-1 and 22c-2 [17 C.F.R. § 270.22c-1 and 22c-2] thereunder.

**COUNT 13 – Violations of Section 37 of the Investment Company Act**

109. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

110. All Defendants, singly or in concert, directly or indirectly, engaged in the course of stealing; unlawful and willful abstracting; unlawful and willful converting to the use of the Board; and/or embezzling funds, securities, and/or assets of Plaintiffs, to protect Prudential's account values and support Prudential's guarantees.

111. By reason of the foregoing, Defendants mentioned in paragraph 110, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25 and Section 37 of the Investment Company Act [15 USC § 80a-37].

**COUNT 14 – Violations of Section 206(4) of the Investment Advisers Act and Custody Rules 206(4)-2, 206(4)-6(a), and 206(4)-6(c) thereunder**

112. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

113. All Defendants, singly or in concert, directly or indirectly, do/did not maintain client assets with "qualified custodians" either in a separate account for each client under that client's name or in an account under the adviser name as agent for the adviser's clients that only contains client assets; and fraudulently exercised voting authority over securities of Plaintiffs without forwarding/mailing proxy voting certificates to Plaintiffs.

114. By reason of the foregoing, Defendants mentioned in paragraph 113, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate 7 USC § 25; and Section 206(4) of the Investment Advisers Act [15 USC

§ 80b-6(4)] and Custody Rules 206(4)-2, 206(4)-6(a), and 206(4)-6(c) [17 C.F.R. § 275.206(4)-2, 206(4)-6(a), and 206(4)-6(c)] thereunder.

## COUNT 15 - Violations of Sections 215(b) and 223 of the Investment Advisers Act

115. Plaintiffs re-allege and incorporate paragraphs 1 through 72 by reference as if fully set forth herein.

116. CGMI and Pruco have the fiduciary duty to safeguard Plaintiffs' assets over which they have custody but (i) CGMI surrendered its fiduciary duty to Pruco and (ii) Pruco entered into participation agreement with the VITs, which permit Prudential, et al. to transfer Plaintiffs' contract value to VITs, which is not a the term of the agreement set out in the Annuity Contract.

117. By reason of the foregoing, Defendants mentioned in paragraph 116, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Sections 215(b) and 223 of the Investment Advisers Act [15 USC § 80b-15(b) and -23].

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants and award damages as follows:

### A. Declaratory Relief:

Declare, determine, and find that Defendants have breached the contract and have committed the violations of the federal securities laws alleged in this Complaint.

### B. Disgorgement and Penalties:

Issue an Order directing

(1) Prudential to pay Plaintiffs (a) $87,064of *compensatory damages* and (b) $174,128 of *punitive damages* pursuant to 7 USC § 25.

(2) Pruco and CGMI to cancel the contract and return the $110,096, which was the account value of Plaintiffs as of 12/31/2010, back to Plaintiffs.

(3) All Defendants to disgorge their respective disgorgements and pay punitive penalties as may be necessary and appropriate.

(4) All Defendants to stop selling the unregistered private placements and "junk bonds".

## C. Further Relief

Grant such other and further relief as may be necessary and appropriate.

## D. Retention of Jurisdiction

Further, the Plaintiffs respectfully request that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Plaintiffs for additional relief within the jurisdiction of this Court.

## VII. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated this 23rd day of March, 2015

Michael H. Wu and Christine T. Wu

## GLOSSARY

| Abbr. / Term | Name / Explanation | Defined at |
|---|---|---|
| AST | Advanced Series Trust | 1 (footnote 1) |
| Bond Portfolio | AST Investment Grade Bond Portfolio | 13 |
| CGMI | Citigroup Global Markets, Inc. | 6 |
| covered fund | hedge fund or private equity fund | 2 |
| CPWM | Citi Personal Wealth Management | 6 |
| Fund, the | Prudential Series Fund, the | 2 |
| IA | Investment Advisor | 6 |
| IM | Investment Manager | 6 |
| LSV | LSV Asset Management | 6 |
| Market Cap | Market Capitalization | 3 (footnote 7) |
| Marsico | Marsico Capital Management LLC | 6 |
| NASD | National Association of Securities Dealers | 7 |
| NAV | Net Asset Value | 8 |
| non-VSA | non-Variable Separate Account, unregistered | 4 |
| NYSE | New York Stock Exchange | 1 |
| PFI | Prudential Financial, Inc. | 1 |
| PI | Prudential Investments LLC | 3 (footnote 5) |
| PICA | Prudential Insurance Company of America | 2 |
| PIM | Prudential Investment Management, Inc. | 12 (footnote 20) |
| PIMS | Prudential Investment Management Services LLC | 9 |
| PIPE | Private Investment in Public Equity | 6 |
| PIPEs | Private Investments in Public Equity | Ex. B-1 |
| PM | Portfolio Manager | 6 |
| PRU | Ticker of PFI Listed in NYSE | 1 |
| Pruco | Pruco Life Insurance Company | 4 |
| Prudential | Prudential Financial Companies | 1 |
| ROE | Return on Equity | 2 |
| SEC | U.S. Securities and Exchange Commission | 2 |
| stage 1 | Daily Private Sales | 1 |
| stage 2 | Quarterversary Public Registration | 1 |
| the Board | the Prudential's Board (of Directors) | 2 |
| TRPA | T. Rowe Price Associates, Inc. | 7 |
| Trust, the | Advance Series Trust, the | 2 |
| USC | U. S. Code | 2 |
| VA | Variable Annuities | 1 |
| VI | Variable Insurance | 2 |
| VITs | Variable Insurance Trusts | 2 |
| VSA | Variable Separate Account, registered | 5 |
| | Pruco Life Flexible Premium Variable Annuity Account | 4 (footnote 8) |
| WBC | William Blair & Company LLC | 7 |

## LIST OF EXHIBITS

A. Annuity Contract Riders / Endorsements

B. B-1. Private Placements in Public Equity (PIPEs)
   B-2a. Prudential Letter Dated December 8, 2011 to Plaintiff(s)
   B-2b. Pruco Sales Material of the Annuity Contract
   B-3. Prudential News 0222360-00001-00 by Darrell Oliver (April 9, 2012)
   B-4. Authorization from the Prudential's Board to Prudential Investments LLC
   B-5. Brochure of Prudential Investments LLC Filed with the SEC (partial)
   B-6. Prudential Letter Dated May 14, 2012 to Plaintiff(s)
   B-7a. Daily Auto-rebalancing: What Prudential Says
   B-7b. Daily Auto-rebalancing: What Prudential Does
   B-8a. Quarterversary Auto-rebalancing: What Prudential Says
   B-8b. Quarterversary Auto-rebalancing: What Prudential Does

C. C-1. Sample Transaction Confirmation from Prudential Annuities
   C-2. Plaintiffs' Letter Dated July 16, 2012 to Prudential (Christopher Hagan)
   C-3. Plaintiffs' e-Mail Dated Feb 13, 2014 to Prudential (Christopher Hagan), et al.
   C-4. Sample 3Q2011 Quarterly Statement from Prudential Annuities
   C-5. Sample 4Q2011 Quarterly Statement from Prudential Annuities
   C-6. Two Quarterversary Public Registrations Done in 2H2011, et al.

D. the Robust Capital Protection Framework (PFI 2011 Annual Report)

E. E-1. Mark Brown Grier's Statements (PRU Q4 2009 Earnings Call)
   E-2. Mark Brown Grier's Statements (PRU Q4 2010 Earnings Call)
   E-3a. Strangfeld's Compensation for 2013
   E-3b. Grier's Compensation for 2013
   E-3c. Carbone's Compensation for 2013
   E-4a. What Carbone Said on February 10, 2011
   E-4b. What Carbone Said on February 9, 2012
   E-5. Prudential Annuity Statement Q4 2010 (partial)

F. F-1. the e-Mail dated 6/11/2012 from Lord, Abbett & Co. LLC
   F-2. the e-Mail dated 6/5/2012 from Eagle Fund Service
   F-3. the e-Mail dated 5/2/2012 from Marsico

# EXHIBIT A

# Annuity Contract
# Riders / Endorsements

# EXHIBIT A

## PRUCO LIFE INSURANCE COMPANY

**Corporate Address:**
2999 North 44th Street, Suite 250
Phoenix, Arizona 85014

**Service Office Address:**
P.O. Box 7960
Philadelphia, PA 19176
Toll Free: 1-888-PRU-2888
Website: www.prudentialannuities.com

Please read this contract (the "Annuity") carefully. It is a legal contract between you and Pruco Life Insurance Company. Unless you direct otherwise, we will pay the named Owner(s), on the Annuity Payment Date, the first of a series of annuity payments, the frequency, period, and dollar amounts of which are determined in accordance with the terms and conditions of the annuity option payable, provided that both you and the Annuitant(s) are then living.

This Annuity is issued subject to its provisions and in consideration of any Purchase Payments you make and we accept.

**RIGHT TO CANCEL:** You may cancel this Annuity for a refund by notification to us in Good Order or by returning the Annuity to our Service Office or to the representative who sold it to you within 10 days after you receive it. The Annuity can be mailed or delivered either to us, at our Service Office, or to the representative who sold it to you. Return of this Annuity by mail is effective on being postmarked, properly addressed and postage prepaid.

Unless otherwise required by applicable law or regulation, the amount of the refund will equal the Account Value as of the Valuation Date we receive the returned Annuity at our Service Office or the cancellation request in Good Order, plus any fees or Tax Charges deducted from the Purchase Payment upon allocation to the Annuity. We recapture any Purchase Credits upon exercise of this Right to Cancel. Please refer to the Annuity Schedule to determine if this Annuity makes provision for any Purchase Credits.

Signed for Pruco Life Insurance Company:

_____          _____
Secretary                               President

**NON-PARTICIPATING INDIVIDUAL FLEXIBLE PREMIUM DEFERRED VARIABLE ANNUITY**

During the Accumulation Period any payments and values based on the Sub-accounts are not guaranteed and will increase or decrease, based on their investment performance.

Payout options are specified in the Annuity. Other payout options may be made available.

P-BLX/IND(2/10)                          1

# EXHIBIT A

### TABLE OF CONTENTS

| | |
|---|---|
| ANNUITY SCHEDULE | 3 |
| DEFINITIONS | 6 |
| RIDERS OR ENDORSEMENTS | 8 |
| ALLOCATION OF ACCOUNT VALUE | 8 |
| OPERATION OF THE SEPARATE ACCOUNT(S) | 8 |
| CHARGES | 10 |
| RIGHTS AND DESIGNATIONS | 10 |
| PURCHASE PAYMENTS | 12 |
| ACCOUNT VALUE | 12 |
| ALLOCATION RULES | 14 |
| DISTRIBUTIONS | 15 |
| DEATH BENEFIT | 17 |
| ANNUITY PAYOUT OPTIONS | 19 |
| ANNUITY TABLES | 20 |
| GENERAL PROVISIONS | 22 |

# EXHIBIT A

## ANNUITY SCHEDULE

**ANNUITY NUMBER:** E1028928                    **ISSUE DATE:** April 16, 2010

**TYPE OF BUSINESS:** Non-Qualified

| | | |
|---|---|---|
| **OWNER:** MICHAEL H. WU | **DATE OF BIRTH:** January 2, 1947 | **SEX:** Male |
| **OWNER:** CHRISTINE T. WU | **DATE OF BIRTH:** August 1, 1950 | **SEX:** Female |
| **ANNUITANT:** MICHAEL H. WU | **DATE OF BIRTH:** January 2, 1947 | **SEX:** Male |

**PURCHASE PAYMENT:** $100,000.00

**PURCHASE PAYMENT AGE LIMITATION:** Purchase Payments may be accepted up to and including age 85 based on the oldest Owner who is a natural person, or the Annuitant if the Annuity is owned by an entity, unless otherwise required by applicable law or regulation to maintain the tax status of this Annuity.

**MINIMUM ADDITIONAL PURCHASE PAYMENT:** $100

**MINIMUM ADDITIONAL PURCHASE PAYMENT UNDER AUTOMATIC PURCHASE PLANS:** $50

**PURCHASE CREDITS:** We add a Purchase Credit to your Annuity with each Purchase Payment received during certain periods, as shown below. Each Purchase Credit is allocated to Account Value when the applicable Purchase Payment is applied to your Account Value. The Purchase Credit is calculated by applying the applicable Purchase Credit Percentage to the Purchase Payment received. The Purchase Credit Percentage depends on the length of time since the Issue Date of the Annuity, and the age of the oldest Owner, or the Annuitant if the Annuity is owned by an entity, at the time the Purchase Payment is received, as shown in the following table. We may recapture Purchase Credits under certain circumstances, as described in this Annuity.

Purchase Credits are applied to the Investment Options in the same ratio as the applicable Purchase Payment.

| Length of Time Since Issue Date | Age of the Oldest Owner (the Annuitant if the Annuity is entity-owned) when Purchase Payment is received | Purchase Credit Percentage |
|---|---|---|
| Less than 4 years | Less than Age 82 | 6.0% |
| Less than 4 years | Ages 82 to 85 | 3.0% |
| 4 or more years | Any Age | 0.0% |

# EXHIBIT A

### ANNUITY SCHEDULE (Continued)

**CONTINGENT DEFERRED SALES CHARGE:**

| Age of Purchase Payment Being Withdrawn | Percentage Applied Against Purchase Payment Being Withdrawn |
|---|---|
| Less than 1 year old | 9.0% |
| 1 year old or older, but not yet 2 years old | 9.0% |
| 2 years old or older, but not yet 3 years old | 9.0% |
| 3 years old or older, but not yet 4 years old | 9.0% |
| 4 years old or older, but not yet 5 years old | 8.0% |
| 5 years old or older, but not yet 6 years old | 8.0% |
| 6 years old or older, but not yet 7 years old | 8.0% |
| 7 years old or older, but not yet 8 years old | 5.0% |
| 8 years old or older, but not yet 9 years old | 2.5% |
| 9 years old or older | 0.0% |

**MINIMUM WITHDRAWAL AMOUNT:** $100

**MAXIMUM FREE WITHDRAWAL PERCENTAGE:** 10%

**MINIMUM SURRENDER VALUE AFTER A PARTIAL WITHDRAWAL:** $2,000

**MINIMUM INVESTMENT OPTION AMOUNT:** $50

**INSURANCE CHARGE:** Assessed daily at an annualized rate of 1.85% until the Valuation Day coinciding with or next following the 9th anniversary of the Issue Date. Thereafter the Insurance Charge is assessed daily at an annualized rate of 1.30%

**ANNUAL MAINTENANCE FEE:** Lesser of $50 or 2% of Account Value, but only if the sum of the Purchase Payments at the time the Fee is due is less than $100,000.

**TRANSFER FEE:** $10 per transfer after the twentieth transfer in any Annuity Year.

**MINIMUM TRANSFER AMOUNT:** $50. We may waive the Minimum Transfer Amount.

**LATEST AVAILABLE ANNUITY DATE:** The first day of the calendar month next following the oldest Owner's or Annuitant's 95th birthday.

**EARLIEST AVAILABLE ANNUITY DATE:** Three years from the Issue Date.

**MINIMUM ANNUITY PAYMENT:** $100 per month

**MINIMUM SURRENDER VALUE AT ANNUITIZATION:** $2,000

**DEFAULT ANNUITY OPTION:** In the absence of an election we receive in Good Order, monthly payments will commence under Option 2 – Payments for Life with a 10 Year Period Certain or a Period Certain of shorter duration if the life expectancy of the Annuitant at the time the option becomes effective is less than 10 years. Such life expectancy will be computed using applicable Internal Revenue Service tables.

P-X/IND(2/10)                    4

# EXHIBIT A

**ANNUITY SCHEDULE (Continued)**

**VARIABLE SEPARATE ACCOUNT(S):** Pruco Life Flexible Premium Variable Annuity Account

**RIDERS AND ENDORSEMENTS MADE A PART OF THE ANNUITY ON THE ISSUE DATE:**
Medically Related Surrender Endorsement
Dollar Cost Averaging Program Rider
Market Value Adjustment Option Rider
Return of Adjusted Purchase Payments Death Benefit Rider
Spousal Highest Daily Lifetime 6 Plus Benefit Rider

# EXHIBIT A

## DEFINITIONS

**Account Value:** The total value of all allocations to the Sub-accounts on any Valuation Day.

**Accumulation Period:** The period of time from the Issue Date through the last Valuation Day immediately preceding the Annuity Date.

**Annuitant:** The natural person named in the Annuity Schedule upon whose life annuity payments are based.

**Annuity Date:** The date on which we apply your Account Value to the applicable annuity payout option and begin the Payout Period.

**Annuity Payment Date:** The date the first annuity payment is payable.

**Annuity Year:** The first Annuity Year begins on the Issue Date and continues through and includes the day immediately preceding the first anniversary of the Issue Date. Subsequent Annuity Years begin on the anniversary of the Issue Date and continue through and include the day immediately preceding the next anniversary of the Issue Date.

**Beneficiary(ies):** The natural person(s) or entity(ies) designated as the recipient of the Death Benefit, or to whom any remaining Period Certain payments may be paid in accordance with the "Annuity Payout Options" section of the Annuity.

**Code or Internal Revenue Code:** The Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder.

**Contingent Annuitant:** The natural person named to become the Annuitant on the Annuitant's death prior to the Annuity Date.

**Due Proof of Death:** Due Proof of Death is satisfied when we receive all of the following in Good Order: (a) a death certificate or documentation acceptable to us, (b) all representations we require or which are mandated by applicable law or regulation in relation to the death claim and the payment of death proceeds; and (c) any applicable election of the method of payment of the Death Benefit, if not previously elected by the Owner(s), by at least one Beneficiary.

**General Account:** Our general investment account which contains all of our assets with the exception of the Variable Separate Account(s) and other segregated asset accounts.

**Good Order:** Good Order is the standard that we apply when we determine whether an instruction is satisfactory. An instruction will be considered in Good Order if it is received at our Service Office: (a) in a manner that is satisfactory to us such that it is sufficiently complete and clear that we do not need to exercise any discretion to follow such instruction and complies with all relevant laws and regulations; (b) on specific forms, or by other means we then permit (such as via telephone or electronic transmission); and/or (c) with any signatures and dates as we may require. We will notify you if an instruction is not in Good Order.

**Investment Option:** A Sub-account or other option available as of any given time to which Account Value may be allocated.

**Issue Date:** The effective date of this Annuity, as shown in the Annuity Schedule.

**Owner(s):** The natural person(s) or entity shown as Owner in the Annuity Schedule unless later changed.

# EXHIBIT A

**Payout Period:** The period starting on the Annuity Date and during which annuity payments are made.

**Purchase Payment:** A cash consideration in currency of the United States of America given to us in exchange for the rights, privileges and benefits outlined in this Annuity.

**Service Office Address:** The location shown on the Cover page of the Annuity where all requests and payments regarding this Annuity are to be sent. We refer to this as our "Service Office." The Service Office Address may be changed at any time. We will notify you in advance of any change in address.

**Spouse:** An individual whom we believe would be recognized as a spouse under federal law.

**Sub-account:** A division of the Variable Separate Account(s) shown in the Annuity Schedule.

**Surrender Value:** The Account Value less any applicable Contingent Deferred Sales Charge, any applicable Tax Charges, any charges assessable as a deduction from the Account Value for any optional benefits provided by rider or endorsement, and any applicable Annual Maintenance Fee.

**Unit:** A share of participation in a Sub-account used to calculate your Account Value prior to the Annuity Date.

**Unit Price:** The value of each Unit of a Sub-account on a Valuation Day.

**Valuation Day:** Every day the New York Stock Exchange is open for trading or any other day that the Securities and Exchange Commission requires mutual funds or unit investment trusts to be valued.

**Valuation Period:** The period of time between the close of business of the New York Stock Exchange on successive Valuation Days.

**Variable Separate Account(s):** The variable separate account(s) shown in the Annuity Schedule.

**we, us, our:** Pruco Life Insurance Company.

**you, your:** The Owner(s) shown in the Annuity Schedule.

P-BLX/IND(2/10)                            7

# EXHIBIT A

### RIDERS OR ENDORSEMENTS

One or more riders or endorsements may be attached and made part of your Annuity. Such riders or endorsements may contain additional or different provisions which may amend or replace the provisions in your Annuity. Such riders or endorsements may also contain provisions applicable to an optional benefit program you have elected. Such programs may impact certain provisions of this Annuity, including, but not limited to, Investment Options, surrenders, withdrawals, transfers, Spousal Continuation, and the Death Benefit. Charges may also apply to any optional benefit provided by rider or endorsement. Pursuant to our rules, you may elect one or more optional benefits we may make available. A schedule supplement may also contain additional fields specific to any optional benefit you have elected. Please refer to any applicable rider, endorsement and their respective schedule supplements for details regarding the impact on any provisions in this Annuity.

¶13.b

### ALLOCATION OF ACCOUNT VALUE

You may maintain Account Value among a number of Investment Options, subject to the limits set out in this Annuity. The variable Investment Options are the Sub-accounts of the Variable Separate Account(s) shown in the Annuity Schedule. The minimum amount you can allocate to an Investment Option ("the Minimum Investment Option Amount") is shown in the Annuity Schedule. You may transfer Account Value between such options, subject to our allocation and transfer rules. Your transfer request must be received by us in Good Order. Transfers may be subject to a fee.

### OPERATION OF THE SEPARATE ACCOUNT(S)

**General:** The assets supporting our obligations under the Annuity may be held in various accounts, depending on the obligation being supported. Assets supporting our obligations during the Accumulation Period are held in separate accounts. In the Payout Period, assets supporting annuity payments are held in our General Account.

**Separate Accounts:** We are the legal owner of assets in the separate accounts. Income, gains and losses, whether or not realized, from assets allocated to these separate accounts, are credited to or charged against each such separate account in accordance with the terms of the annuities supported by such assets without regard to our general corporate operations or other income, gains or losses or to the income, gains or losses in any other of our separate accounts. We will maintain assets in each separate account with a total market value at least equal to the reserve and other liabilities we must maintain in relation to the annuity obligations supported by such assets. These assets may only be charged with liabilities which arise from such annuities.

**Variable Separate Account(s):** The separate account(s) to which we allocate assets supporting our obligations under this Annuity is the Variable Separate Account(s). This separate account(s) consists of multiple Sub-accounts. The Variable Separate Account(s) was established by us pursuant to Arizona law. The Variable Separate Account(s) also holds assets of other annuities issued by us with values and benefits that vary according to the investment performance of the variable Sub-accounts.

The amount of our obligations in relation to allocations to the Variable Separate Account(s) is based on the investment performance of the Sub-accounts. However, the guarantees provided under the Annuity are our general corporate obligations.

¶13.a

The Variable Separate Account(s) is registered with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940 (the "1940 Act") as a unit investment trust, which is a type

P-BLX/IND(2/10)                                8

# EXHIBIT A

of investment company. This does not involve any supervision by the SEC of the investment policies, management or practices of the Variable Separate Account(s).

¶13.d  Sub-accounts may invest in underlying mutual funds or portfolios. We may change the investment policy of any or all Sub-accounts, add Sub-accounts, eliminate Sub-accounts, combine Sub-accounts, restrict or prohibit additional allocations to certain Sub-accounts, limit access to Sub-accounts, or substitute underlying mutual funds or portfolios of underlying mutual funds, subject to any required regulatory approvals. Please refer to the "Reserved Rights" section for additional information. Values and benefits based on allocations to the Sub-accounts will vary with the investment performance of the underlying mutual funds or fund portfolios, as applicable. We do not guarantee the investment results of any Sub-account.

¶13.c  We may transfer assets of the Variable Separate Account(s), which we determine to be associated with the class of contracts to which this Annuity belongs, to another Variable Separate Account(s). If this type of transfer is made, the term "Variable Separate Account(s)" as used in this Annuity, shall include the Variable Separate Account(s) to which the assets were transferred.

P-BLX/IND(2/10)                                    9

# EXHIBIT A

## CHARGES

**General:** The charges which are, or may be, deducted from your Annuity include, but are not limited to: any applicable Contingent Deferred Sales Charge, the Insurance Charge, the Annual Maintenance Fee, Tax Charges, a Transfer Fee, and any charges for any optional benefits provided by rider or endorsement.

**Contingent Deferred Sales Charge:** The Contingent Deferred Sales Charge for each Purchase Payment is a percentage of the Purchase Payment being withdrawn. The charge decreases as the Purchase Payment ages. The aging of a Purchase Payment is measured from the date it is allocated to your Annuity. If you make a withdrawal of a Purchase Payment on the day before an anniversary of the date that Purchase Payment was made, we will use the Contingent Deferred Sales Charge percentage that would apply if the withdrawal was made on the following day. The charge percentage is shown in the "Contingent Deferred Sales Charge" section of the Annuity Schedule. The charge is deducted from the Investment Options in the same proportion as the withdrawal upon which it is assessed.

**Annual Maintenance Fee:** This is a fee deducted on each anniversary of the Issue Date occurring on or before the Annuity Date, and upon surrender. However, we will waive the Annual Maintenance Fee due at surrender if the surrender occurs within 30 days after an Annual Maintenance Fee was last deducted. The basis for this charge is shown in the Annuity Schedule. We will waive all or a portion of this fee, if we are required by law or regulation, to meet any minimum nonforfeiture requirements. We will also waive this fee after the Annuity Date, and when a Death Benefit is determined, unless Spousal Continuation occurs. We reserve the right to waive this fee at any other time on a non-discriminatory basis.

As of the Valuation Day the Annual Maintenance Fee is due, the fee is deducted pro-rata from the Account Value of all Sub-accounts to which your Account Value is allocated.

**Tax Charges:** The Annuity may include a charge generally intended to approximate any applicable premium tax, retaliatory tax and other taxes imposed on us. In some cases the Tax Charges may be more, and in some cases less, than the actual amount of taxes we are required to pay with respect to a particular Annuity. We may, in our discretion, pay these taxes when due and deduct the Tax Charges from the Account Value at a later date.

**Transfer Fee:** The Transfer Fee is shown in the Annuity Schedule. The fee is deducted pro-rata from all Sub-accounts in which you maintain Account Value immediately subsequent to the transfer. Transfers made through any electronic method or program we specify are not counted in calculating any applicable Transfer Fee. For purposes of calculating the Transfer Fee, all transfers made on the same Valuation Day count as one transfer.

**Insurance Charge:** The Insurance Charge is assessed daily, based on an annualized rate, as shown in the Annuity Schedule and the Schedule Supplements of certain optional benefit riders we may make available. See the "Account Value" section of this Annuity for a description of how the Insurance Charge is deducted.

## RIGHTS AND DESIGNATIONS

You may exercise the rights, options and privileges granted in this Annuity or permitted by us. Your rights to make future changes under this Annuity terminate as of the date we receive notice of death of the decedent. No rights of survivorship are provided except as provided herein.

You make certain designations that apply to the Annuity. These designations are subject to our rules and to various regulatory or statutory requirements, depending on the use of the Annuity. These designations may include an Owner(s), an Annuitant(s), a Contingent Annuitant(s), a Beneficiary(ies), and a contingent Beneficiary(ies). Certain designations are required, as indicated below.

# EXHIBIT A

**Owner(s):** An Owner must be named. You may name more than one Owner; however, we may limit the number of Owners. If you name more than one Owner, all rights reserved to Owners are then held equally by all Owners. We require the consent in Good Order of all Owners and any other party with current vested rights for any transaction for which we require the written consent of Owners. However, if the Owners each provide us with instructions that we find acceptable, we will permit an Owner to act independently on behalf of all the Owners with respect to those transactions which would otherwise require the written consent of all Owners. We will send all communications to the address of the first named Owner.

**Annuitant:** You must name an Annuitant. We do not accept a designation of joint Annuitants during the Accumulation Period. You may name one or more Contingent Annuitant(s), subject to our approval. If the Annuitant is not an Owner, and the Annuitant predeceases any Owner who is a natural person, not an entity:

   (a)  The designated Contingent Annuitant becomes the Annuitant; or

   (b)  If no Contingent Annuitant was designated, the Owner becomes the Annuitant; or

   (c)  If there are multiple Owners who are natural persons, the oldest of such Owners becomes the Annuitant if no Contingent Annuitant was designated.

**Beneficiary(ies):** The Death Benefit is payable to the Beneficiary(ies). You may designate more than one primary or contingent Beneficiary. If you make such a designation, the proceeds are payable in equal shares to the survivors in the appropriate Beneficiary class, unless you request otherwise in Good Order.

Unless otherwise required by law, if the primary Beneficiary(ies) predeceases the decedent, the Death Benefit proceeds will become payable to the contingent Beneficiary(ies). If the Beneficiary(ies) dies after the death of the decedent, the Death Benefit proceeds will be payable to the Beneficiary's(ies') estate(s) upon our receipt of Due Proof of Death of the decedent. If no Beneficiary is alive when the Death Benefit proceeds are determined or there is no Beneficiary designation, the proceeds will vest in any surviving Owner(s), including an Owner that is an entity. If there is no surviving Owner(s), the proceeds will vest in your estate.

**Changing Designations:** You may request to change the Owner(s), Annuitant, Contingent Annuitant, Beneficiary and contingent Beneficiary designations by sending us a request in Good Order. Such changes will be subject to our acceptance. Some of the changes we may not accept include, but are not limited to: (a) a new Owner(s) subsequent to the death of the Owner or, if there are multiple Owners, the first of such Owners to die, unless the change of Owner is the result of Spousal Continuation; (b) a new Owner such that the new Owner is older than the age for which we would then issue the Annuity as of the effective date of such change, unless the change of Owner is the result of Spousal Continuation, (c) a new Annuitant subsequent to the Annuity Date if the annuity option selected includes a life contingency; (d) a new Annuitant prior to the Annuity Date if the Owner is an entity; and (e) a designation change if the change request is received at our Service Office after the Annuity Date.

If there is a change of Owner(s) or Annuitant, the Latest Available Annuity Date will be based on the age of the oldest Owner(s) or Annuitant once the change is made. The Annuity Date must: (a) be on or after the Earliest Available Annuity Date and on or before the new Latest Available Annuity Date; and (b) must be consistent with applicable laws and regulations at the time.

A change of Owner(s) or Annuitant will take effect on the date the notice of change is received at our Service Office in Good Order. An Owner(s) may seek to transfer ownership of the Annuity, subject to the interest of any assignee or beneficiary of record. We reserve the right to reject any ownership change at

P-BLX/IND(2/10)                          11

# EXHIBIT A

any time, on a non-discriminatory basis. We assume no responsibility for the validity or tax consequences of any change of ownership.

A change of Beneficiary will take effect on the date the notice of change is received at our Service Office in Good Order.

Any change of Owner(s), Annuitant, or Beneficiary(ies) we accept is subject to any transactions processed by us before we receive the notice of change.

**Common Disaster:** If an Owner is a natural person, and if any other Owner or Beneficiary dies with the Owner in a common disaster, it must be proved to our satisfaction that the Owner died first. When there is insufficient evidence to determine the order of death, then, unless prohibited by law, we will deem the Owner to be the last survivor and pay the proceeds to any remaining Beneficiary, or if none, to any remaining contingent Beneficiary, or if none, to any surviving Owner, or if none, to the Owner's estate.

If: (a) the Owner is an entity; (b) no Contingent Annuitant has been designated; and (c) the Annuitant and the Beneficiary die in a common disaster, then it must be proved to our satisfaction that the Annuitant died first. Unless prohibited by law, when there is insufficient evidence to determine the order of death, we will deem the Annuitant to be the last survivor and pay the proceeds to any remaining Beneficiary, or if none, to any remaining contingent Beneficiary, or if none, to the Owner.

## PURCHASE PAYMENTS

**Initial Purchase Payment:** Issuance of an Annuity represents our acceptance of an initial Purchase Payment. The amount of your initial Purchase Payment evidenced by this Annuity is shown in the Annuity Schedule. Purchase Payments are allocated to the Investment Options according to your instructions.

**Additional Purchase Payments:** The Purchase Payment Age Limitation and the Minimum Additional Purchase Payment are as shown in the Annuity Schedule. We may further limit or reject certain Purchase Payments. Additional Purchase Payments will be allocated to the Investment Options according to your instructions. If you have not provided any allocation instructions with the additional Purchase Payment, we will allocate it on a pro-rata basis to the Sub-accounts in which your Account Value is then allocated, excluding any Sub-accounts to which you are not permitted to electively allocate or transfer Account Value. If the Account Value in the Sub-accounts to which you may electively allocate Account Value is zero, we will allocate your additional Purchase Payment to a money market Investment Option.

## ACCOUNT VALUE

**Account Value in the Sub-accounts:** We determine your Account Value separately for each Sub-account. To determine the Account Value in each Sub-account, we multiply the Unit Price, as of the Valuation Day for which the calculation is being made, by the number of Units attributable to your Annuity in that Sub-account as of that Valuation Day.

**Units:** The number of Units attributable to this Annuity in a Sub-account is the number of Units you purchased less the number of Units liquidated. We determine the number of Units involved in any transaction specified in dollars by dividing the dollar value of the transaction by the Unit Price of the affected Sub-account as of the Valuation Day applicable to such transaction.

**Unit Price:** The Unit Price for each Sub-account is the net investment factor for that Valuation Period, multiplied by the Unit Price for the immediately preceding Valuation Day. The Unit Price for a Valuation Period applies to each day in the period.

P-BLX/IND(2/10)                    12

# EXHIBIT A

**Net Investment Factor:** Each Sub-account has a net investment factor. The net investment factor is an index that measures the investment performance of, and charges assessed against, a Sub-account from one Valuation Period to the next.

The net investment factor for a Valuation Period is (a) divided by (b), less (c), where:

    (a) is the net result of:
        (1) the net asset value per share of the underlying mutual fund shares held by that Sub-account at the end of the current Valuation Period plus the per share amount of any dividend or capital gain distribution declared and unpaid (accrued) by the underlying mutual fund, plus or minus
        (2) any per share charge or credit during the current Valuation Period as a provision for taxes attributable to the operation or maintenance of that Sub-account.

    (b) is the net result of:
        (1) the net asset value per share of the underlying mutual fund shares held by that Sub-account at the end of the preceding Valuation Period plus the per share amount of any dividend or capital gain distribution declared and unpaid (accrued) by the underlying mutual fund, plus or minus
        (2) any per share charge or credit during the preceding Valuation Period as a provision for taxes attributable to the operation or maintenance of the Sub-account.

    (c) is the Insurance Charge corresponding to the portion of the 365 day year (366 for a leap year) that is in the current Valuation Period.

We value the assets in the Sub-accounts at their fair market value in accordance with accepted accounting practices and applicable laws and regulations. The net investment factor may be greater than, equal to, or less than one.

# EXHIBIT A

### ALLOCATION RULES

You may allocate your Account Value among the Investment Options we make available, excluding any Investment Options to which you are not permitted to electively allocate or transfer Account Value. We may limit the availability of Investment Options for additional Purchase Payments or transfers. Should you request a transaction that would leave less than the Minimum Investment Option Amount, shown in the Annuity Schedule, in an Investment Option, we may, to the extent permitted by law, add the balance of your Account Value in the applicable Investment Option to the transaction and close out your balance in that Investment Option.

**Transfer Restrictions:** We may limit the number of transfers in any Annuity Year for all existing or new Owners in order to preserve the tax status of your Annuity. In addition, in light of the risks that frequent transfers impose upon Owners and other investors in the Variable Separate Account(s) and/or mutual fund portfolios that serve as funding vehicles for the Sub-accounts, we may limit transfer activity and impose other requirements or charges to minimize these risks, including but not limited to, requiring a minimum time period between each transfer, limiting the number of transfers in any Annuity Year or refusing any transfer request for an Owner or certain Owners.

Where permitted by law, you may authorize a third party to transfer Account Values on your behalf. Such authorization is subject to our acceptance and to the transfer restrictions described in the preceding paragraph. We may suspend or cancel our acceptance of the authorization at any time. We may restrict the Investment Options available for transfers or allocation of Purchase Payments by such third party. If we do so, we will give the third party advance notice.

We will not restrict the available Investment Options if we receive evidence satisfactory to us that: (a) a court of competent jurisdiction has appointed such third party to act on your behalf; or (b) you have executed a power of attorney naming such third party to act on your behalf for insurance transactions. We may refuse to accept, or suspend or cancel our acceptance of, a power of attorney at any time.

# EXHIBIT A

## DISTRIBUTIONS

**General:** We require you to submit a request in Good Order to our Service Office for any withdrawal or surrender. We may also require that you send your Annuity to our Service Office as part of any surrender request. Unless we receive instructions from you prior to a withdrawal, we will take the withdrawal pro-rata from the Sub-accounts in which your Account Value is then allocated. We price any distribution on the Valuation Day we receive all required materials in Good Order.

**Surrender:** Surrender of your Annuity for its Surrender Value is permitted during the Accumulation Period.

**Free Withdrawals:** Each Annuity Year you may withdraw a limited amount of Account Value without application of any Contingent Deferred Sales Charge ("free withdrawal"). The Minimum Withdrawal Amount, the Maximum Free Withdrawal Percentage, and the Minimum Surrender Value After a Partial Withdrawal are shown in the Annuity Schedule. Free withdrawal amounts are not available if you surrender your Annuity. If you do not make a free withdrawal during an Annuity Year, you are not permitted to carry over the free withdrawal amount to a subsequent Annuity Year.

The Maximum Free Withdrawal Percentage is applied to the total amount of "new" Purchase Payments to determine the maximum free withdrawal amount. "New" Purchase Payments are those received that are still subject to any applicable Contingent Deferred Sales Charge. The applicable Contingent Deferred Sales Charge may apply to withdrawals exceeding the maximum free withdrawal amount. Amounts withdrawn as free withdrawals are not treated as a withdrawal of Purchase Payments for purposes of calculating future free withdrawal amounts and any applicable Contingent Deferred Sales Charges.

**Partial Withdrawals:** You may withdraw part of your Surrender Value. If the amount of the partial withdrawal request reduces your Account Value below the Minimum Surrender Value After a Partial Withdrawal, we may treat your request as a request for a full surrender.

For partial withdrawal purposes, amounts are deemed to be withdrawn from your Annuity in the following order:

    (1) from any amount then available as a free withdrawal; then from

    (2) "old" Purchase Payments not previously withdrawn (those Purchase Payments to which Contingent Deferred Sales Charges no longer apply prior to the withdrawal); then from

    (3) "new" Purchase Payments not previously withdrawn (if there are multiple "new" Purchase Payments, the one received earliest is withdrawn first, then the one received next earliest, and so forth); then from

    (4) other Surrender Value.

**Required Minimum Distributions:** If your Annuity is being used for certain qualified purposes under the Internal Revenue Code, you may be required to begin receiving minimum distributions on a periodic basis from your Annuity. The total amount of the minimum distributions required under the Code may depend on other annuities, savings or investments you have. At your request, we will calculate a Required Minimum Distribution, assuming the minimum distribution amount is based solely on the value of your Annuity. The amount we calculate will not be based on any other annuities, savings or investments. You may elect to have the Required Minimum Distribution paid out on a monthly, quarterly, semi-annual or annual basis through a program of systematic withdrawals we make available.

# EXHIBIT A

Unless we receive other instructions from you, we will take each Required Minimum Distribution pro-rata from the Investment Options to which your Account Value is allocated at the time of the distribution. If the amount of the Required Minimum Distribution reduces your Account Value below the Minimum Surrender Value After a Partial Withdrawal, we may treat the distribution as a full surrender of the Annuity.

No Contingent Deferred Sales Charge is assessed against amounts withdrawn as Required Minimum Distributions over your life or life expectancy, but only if we calculate the Required Minimum Distribution amount for this Annuity and you are participating in a systematic withdrawal program established for their payment. The Contingent Deferred Sales Charge may apply to amounts withdrawn to meet minimum distributions in relation to other annuities, savings and investments you may have or to any minimum distributions that are based on this Annuity but which are not calculated by us.

Amounts withdrawn as Required Minimum Distributions are considered to come first from the amounts available as a free withdrawal. For purposes of calculating any applicable Contingent Deferred Sales Charge, Required Minimum Distributions greater than the free withdrawal amount are not deemed to be a withdrawal of Purchase Payments.

# EXHIBIT A

### DEATH BENEFIT

The person upon whose death the Death Benefit during the Accumulation Period is determined is referred to as the "decedent." A Death Benefit is payable only if your Account Value at the time of the decedent's death is greater than zero.

If the Owner is a natural person, not an entity, the Owner is the decedent upon his or her death. If there is more than one Owner, each being a natural person and not an entity, the first of such Owners to die is the decedent upon his or her death. If the Owner is an entity, and there is no Contingent Annuitant, then the Annuitant is the decedent and the Death Benefit is payable upon the Annuitant's death.

The Death Benefit is determined as of the date we receive Due Proof of Death of the decedent. Unless Spousal Continuation occurs, on the date we receive Due Proof of Death we transfer all amounts due each Beneficiary from whom we do not have payment instructions to a money market Investment Option until we receive such instructions in Good Order.

The amount of the Death Benefit is equal to the Account Value on the date we receive Due Proof of Death of the decedent, less the amount of any Purchase Credits applied during the period beginning 12 months prior to the decedent's date of death, and ending on the date we receive Due Proof of Death of the decedent. We call this the "Basic Death Benefit." Please refer to the Annuity Schedule to determine if this Annuity makes provision for any Purchase Credits.

In the event of death before the Annuity Date, the Death Benefit must be distributed within: (a) five years of the date of death of the decedent; or (b) as to each Beneficiary, over a period not extending beyond the life expectancy of the Beneficiary or over the life of the Beneficiary. Except as noted below in the "Spousal Continuation" section, we assume that the Death Benefit is to be paid out under (a), above, unless we receive a different election.

The Owner(s) may elect the method of payment to each Beneficiary, subject to our then current rules, prior to the date of death of the decedent. When no such election is made as to a specific Beneficiary, such Beneficiary must elect the method of payment within 60 days of the date we receive all required documentation in Good Order in order to pay the Death Benefit to that Beneficiary. If no election is made within 60 days, the default will be distribution within five years of the date of death of the decedent as noted in (a) above. In addition, distribution after a decedent's death to be paid over the life expectancy or over the life of the Beneficiary under (b), above, must commence within one year of the date of death.

The Owner may elect to have any amount of the proceeds due to a Beneficiary applied under any of the Annuity Payout Options described in the "Annuity Payment Options" section, or any other option we then make available. If you made such election, a Beneficiary may not alter such election. However, if you have not previously made such election, a Beneficiary may make such an election as to the proceeds due that Beneficiary. The Beneficiary will be the "measuring life" for determining the amount of any annuity payments dependent on the continuation of life. We may require evidence satisfactory to us of the age of the measuring life prior to commencement of any annuity payments.

In the event of death on or after the Annuity Date, we distribute any payments due subsequent to an Owner's death at least as rapidly as under the method of distribution in effect as of the date of such Owner's death.

No Death Benefit is payable upon the Annuitant's death during the Accumulation Period if the Owner is an entity and a Contingent Annuitant has been designated. In this event, the Contingent Annuitant becomes the Annuitant and the Annuity continues.

P-BLX/IND(2/10)                          17

# EXHIBIT A

**Spousal Continuation:** We allow the Spouse to continue the Annuity subsequent to a decedent's death, subject to our rules and subject to our receipt of Due Proof of Death. The situations where the Annuity may continue subsequent to a death will be determined by us. For example, these situations may include when on the date we receive Due Proof of Death of the decedent:

(a) there is only one Owner of the Annuity and there is only one Beneficiary who is the Owner's Spouse, or

(b) there are two Owners who are married to each other on the date of death of the decedent, and the surviving Owner is the sole primary Beneficiary under the Annuity, or

(c) there are two Owners who are married to each other on the date of death of the decedent, and no Beneficiary designation has been elected, we then assume that the surviving Spouse will be the sole primary Beneficiary.

Spousal Continuation may occur only once.

Upon continuation of the Annuity by the Spouse, we will waive any Contingent Deferred Sales Charge applicable to Purchase Payments made before Spousal Continuation. In addition, the amount of the Death Benefit will be equal to the Account Value on the date we receive Due Proof of Death, and will not be reduced by any Purchase Credits. However, if the Annuity is surrendered within 12 months of Spousal Continuation, we will deduct from the Surrender Value any Purchase Credits applied during the period beginning 12 months prior to the date of the decedent's death and ending on the date we receive Due Proof of Death. We reserve the right to waive, on a non-discriminatory basis, our right to deduct such Purchase Credits.

# EXHIBIT A

## ANNUITY PAYOUT OPTIONS

**General:** This Annuity provides for payments under one of the Annuity Payout Options described below. Any other available Annuity Payout Options, in addition to those shown, may be selected with our consent. Certain Annuity Payout Options may not be available, depending on the age of the Annuitant. You will be the payee of the payments under the Annuity Payout Option selected, unless we receive other instructions in Good Order.

Annuity payments can be guaranteed for a period certain or for a period certain and life, as described below. You may choose an Annuity Date, an annuity option and the frequency of annuity payments. Your choice of Annuity Date and annuity option may be limited, depending on your use of the Annuity. The Earliest Available Annuity Date and Latest Available Annuity Date as of the Issue Date are shown in the Annuity Schedule. You may change your choices at any time up to thirty days before any Annuity Date you selected. We must receive your request in Good Order. If there is any remaining Contingent Deferred Sales Charge applicable to any Purchase Payment as of the Annuity Date, we may restrict the availability of certain Annuity Payout Options we offer.

If, on the Annuity Date, the Surrender Value is less than the Minimum Surrender Value at Annuitization shown in the Annuity Schedule, or the Surrender Value would provide an initial payment amount of less than the Minimum Annuity Payment shown in the Annuity Schedule, we reserve the right to pay you the Account Value in one lump sum in full satisfaction of our obligations under this Annuity.

    a) **Option 1 - Payments for a Period Certain:** Under this option, income is payable periodically for the number of years selected (the "Period Certain"), subject to our then current rules. Should the Owner die before the end of the Period Certain, the remaining Period Certain payments are paid to the named Beneficiary, or your estate if no Beneficiary is named, until the end of the Period Certain.

    b) **Option 2 – Payments for Life with a Period Certain:** Under this option, income is payable periodically for the number of years selected (the "Period Certain"), subject to our then current rules, and thereafter until the death of the Annuitant. Should the Annuitant die before the end of the Period Certain, the remaining Period Certain payments are paid to the named Beneficiary, or your estate if no Beneficiary is named, until the end of the Period Certain.

We may require evidence satisfactory to us of the age of the Annuitant upon whose life payment amounts are calculated prior to commencement of any annuity payments.

**Death During the Payout Period:** In the Payout Period, subsequent to the death of the Annuitant, we continue to pay any Period Certain payments (payments not contingent on the continuance of any life) to the Owner (or named payee, if requested by the Owner) or, if applicable, any named Beneficiary. If no Beneficiary has been named, any remaining Period Certain payments will be paid to your estate. Note that the Beneficiary designation during the Accumulation Period is applicable to the Payout Period unless you have indicated otherwise.

**Default Annuity Option:** In the absence of an election we receive in Good Order, we will apply the Default Annuity Option shown in the Annuity Schedule.

**Recovery of Excess Annuity Payments:** We may recover any annuity payments we have made after the Annuitant's death under any annuity option (other than one that provides for "Period Certain" payments).

**Annuity Payments:** Annuity payments under Option 1 and 2 above do not fluctuate. The Account Value on the Annuity Date, less any applicable Tax Charges, is used to determine the annuity payments. The

# EXHIBIT A

payment amount will be determined based on the annuity rates for the annuity option and the frequency of payment selected. The annuity rates per $1,000 of value for Monthly Annuity Payments under Options 1 and 2 above will not be less than those shown in the Annuity Tables.

## ANNUITY TABLES

The rates in Tables 1 and 2 below are applied to the Account Value on the Annuity Date to compute the minimum amount of the annuity payment for the payout options described on the preceding page. Table 1 is used to compute the minimum annuity payment under Option 1 (Payments for a Period Certain). Table 2 is used to compute the minimum initial annuity payment under Option 2 (Payments for Life with a Period Certain), assuming a 10 year Period Certain.

The rates used in each table are applied per $1,000 of Account Value, as of the Annuity Date. We used an interest rate of 1.0% per year in preparing Table 1, and an interest rate of 2.0% per year in preparing Table 2. Table 2 assumes 120 monthly payments certain. The annuity payments in Table 2 are based on the Annuitant's "adjusted age" and sex. The adjusted age is the Annuitant's age as of the Annuitant's last birthday prior to the date on which the first payment is due, adjusted as shown in the "Translation of Adjusted Age" table below. When we computed the amounts shown in Table 2, we used the Annuity 2000 valuation mortality table, with four-year age setbacks and projected mortality improvement factors (modified Scale G) projected from the age at annuitization to the age at which the probability of survival is needed in the calculation of the annuity payment.

| Translation of Adjusted Age | | | |
|---|---|---|---|
| Calendar Year in Which First Payment Is Due | Adjusted Age | Calendar Year in Which First Payment Is Due | Adjusted Age |
| 2010 through 2019 | Actual Age minus 1 | 2060 through 2069 | Actual Age minus 6 |
| 2020 through 2029 | Actual Age minus 2 | 2070 through 2079 | Actual Age minus 7 |
| 2030 through 2039 | Actual Age minus 3 | 2080 through 2089 | Actual Age minus 8 |
| 2040 through 2049 | Actual Age minus 4 | 2090 through 2099 | Actual Age minus 9 |
| 2050 through 2059 | Actual Age minus 5 | | |

### Amount of Monthly Payment For Each $1,000 Applied

| Table 1 – Payments for a Period Certain | | | | | | | |
|---|---|---|---|---|---|---|---|
| Number of Years | Monthly Payment | Number of Years | Monthly Payment | Number of Years | Monthly Payment | Number of Years | Monthly Payment |
| 1 | $ 83.71 | 8 | $ 10.83 | 14 | $ 6.37 | 20 | $ 4.59 |
| 2 | 42.07 | 9 | 9.68 | 15 | 5.98 | 21 | 4.40 |
| 3 | 28.18 | 10 | 8.75 | 16 | 5.63 | 22 | 4.22 |
| 4 | 21.24 | 11 | 7.99 | 17 | 5.33 | 23 | 4.05 |
| 5 | 17.08 | 12 | 7.36 | 18 | 5.05 | 24 | 3.90 |
| 6 | 14.30 | 13 | 6.83 | 19 | 4.81 | 25 | 3.76 |
| 7 | 12.32 | | | | | | |

# EXHIBIT A

| Table 2 – Payments for Life with a 10 Year Period Certain | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Adjusted Age | Male | Female | Adjusted Age | Male | Female | Adjusted Age | Male | Female |
| 41 | 2.66 | 2.52 | 61 | 3.79 | 3.48 | 81 | 6.68 | 6.25 |
| 42 | 2.69 | 2.55 | 62 | 3.88 | 3.56 | 82 | 6.87 | 6.46 |
| 43 | 2.73 | 2.58 | 63 | 3.98 | 3.64 | 83 | 7.06 | 6.67 |
| 44 | 2.77 | 2.61 | 64 | 4.08 | 3.73 | 84 | 7.24 | 6.89 |
| 45 | 2.81 | 2.64 | 65 | 4.19 | 3.82 | 85 | 7.42 | 7.10 |
| 46 | 2.85 | 2.68 | 66 | 4.30 | 3.92 | 86 | 7.60 | 7.31 |
| 47 | 2.90 | 2.72 | 67 | 4.42 | 4.02 | 87 | 7.77 | 7.51 |
| 48 | 2.94 | 2.76 | 68 | 4.55 | 4.13 | 88 | 7.93 | 7.70 |
| 49 | 2.99 | 2.80 | 69 | 4.68 | 4.25 | 89 | 8.08 | 7.88 |
| 50 | 3.04 | 2.84 | 70 | 4.81 | 4.37 | 90 | 8.22 | 8.05 |
| 51 | 3.10 | 2.88 | 71 | 4.96 | 4.50 | 91 | 8.35 | 8.20 |
| 52 | 3.15 | 2.93 | 72 | 5.11 | 4.64 | 92 | 8.46 | 8.34 |
| 53 | 3.21 | 2.98 | 73 | 5.26 | 4.79 | 93 | 8.57 | 8.47 |
| 54 | 3.27 | 3.03 | 74 | 5.43 | 4.94 | 94 | 8.67 | 8.58 |
| 55 | 3.34 | 3.09 | 75 | 5.59 | 5.10 | 95 | 8.76 | 8.68 |
| 56 | 3.40 | 3.14 | 76 | 5.76 | 5.28 | | | |
| 57 | 3.47 | 3.20 | 77 | 5.94 | 5.46 | | | |
| 58 | 3.55 | 3.27 | 78 | 6.12 | 5.64 | | | |
| 59 | 3.62 | 3.33 | 79 | 6.31 | 5.84 | | | |
| 60 | 3.71 | 3.40 | 80 | 6.49 | 6.04 | | | |

# EXHIBIT A

### GENERAL PROVISIONS

**Entire Contract:** This Annuity, including the Annuity Schedule, any riders, endorsements, schedule supplements, and amendments that are made part of this Annuity, are the entire contract. This Annuity may be changed or modified only in a writing signed by our President, a Vice President, or Secretary. We are not bound by any promises or representations made by, or to, any other person.

**Incontestability:** We will not contest this Annuity. Any statements made in applying for the Annuity are considered representations, not warranties.

**Misstatement of Age or Sex:** If there has been a misstatement of the age and/or sex of any person upon whose life any amounts we are obligated to determine in order to make any payment, including charges and annuity payments, the Death Benefit or any increase to Account Value under the "Spousal Continuation" section, we will adjust such amounts to conform to that for the correct age and/or sex. As to annuity payments: (a) any underpayments by us will be remedied on the next payment following correction with interest at a rate not less than that required by applicable law; and (b) any overpayments by us will be charged against future amounts payable by us under your Annuity.

**Transfers, Assignments or Pledges:** Generally, your rights in this Annuity may be transferred, assigned or pledged for loans. However, these rights may be limited, depending on your use of the Annuity. You may assign this Annuity before the Annuity Date. We reserve the right to reject any transfer, assignment or pledge at any time, on a non-discriminatory basis. An assignment will take effect on the date the notice of assignment is received at our Service Office in Good Order. Any assignment we accept is subject to any transactions processed by us before we receive the notice of assignment. You may exercise these rights subject to the interest of any assignee or irrevocable beneficiary of record. We assume no responsibility for the validity or tax consequences of any assignment.

**Nonparticipation:** The Annuity does not share in our profits or surplus earnings.

**Deferral of Transactions:** We may defer any annuity payment for a period not to exceed the lesser of 6 months or the period permitted by law. If we defer a distribution or transfer from any annuity payout for more than thirty days, we will pay interest as required by state law. We may defer any distribution from any Sub-account or any transfer from a Sub-account for a period not to exceed seven calendar days from the date the transaction is effected.

In addition to the transfer restrictions above, all transactions into, out of, or based on any Sub-account may be postponed whenever: (1) the New York Stock Exchange is closed (other than customary holidays or weekends) or trading on the New York Stock Exchange is restricted as determined by the SEC; (2) the SEC permits postponement and so orders; or (3) the SEC determines that an emergency exists making valuation or disposal of securities not reasonably practical.

**Claims of Creditors:** To the extent permitted by law, no payment or value under this Annuity is subject to the claims of your creditors or those of any other Owner, any Annuitant, or any Beneficiary.

**Evidence of Survival:** Before we make a payment, we have the right to require proof of continued life and any other documentation we need to make a payment. We can require this proof for any person whose life or death determines whether or to whom we must make the payment.

**Tax Reporting and Withholding:** We comply with all applicable federal and state tax reporting and withholding laws and regulations with respect to this Annuity. Events giving rise to such tax reporting and withholding include, but are not limited to: (a) annuity payments; (b) payment of Death Benefits; (c) other distributions from the Annuity; and (d) transfers and assignments.

# EXHIBIT A

**Facility of Payment:** Subject to applicable law, we reserve the right, in settlement of full liability, to make payments to a guardian, conservator or other legal representative if a payee is legally incompetent.

**Participation and Termination of Certain Programs We May Offer:** To elect to participate in, or to terminate participation in, any program we may offer, we must receive your request in Good Order at our Service Office.

**Minimum Benefits:** Any benefits available under this Annuity are not less than the minimum benefits required by law.

**Reports to You:** We will provide you with reports at least once annually. You may request additional reports; we may charge up to $50 for each such additional report.

**Reserved Rights:** In addition to rights specifically reserved elsewhere in this Annuity, we reserve the right to perform any or all of the following: (a) combine a Sub-account with other Sub-accounts, (b) combine the Variable Separate Account(s) shown in the Annuity Schedule with other "unitized" separate accounts; (c) deregister the Variable Separate Account(s) shown in the Annuity Schedule under the Investment Company Act of 1940; (d) operate the Variable Separate Account(s) shown in the Annuity Schedule as a management investment company under the Investment Company Act of 1940 or in any other form permitted by law; (e) make changes required by any change in the federal securities laws, including, but not limited to, the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, or any changes to the Securities and Exchange Commission's interpretation thereof; (f) make changes that are necessary to maintain the tax status of your Annuity, any rider, amendment or endorsement attached hereto or any charge or distribution from your Annuity under the Internal Revenue Code, (g) to establish a provision for federal income taxes if we determine in our sole discretion, that we will incur a tax as a result of the operation of the Separate Account; (h) make any changes required by Federal or state laws with respect to annuity contracts; and (i) to the extent dictated by any underlying mutual fund, impose a redemption fee or restrict transactions within any Sub-account. We reserve the right to modify this Annuity without receiving your prior consent, except as may be required by any applicable law, if we are required to make changes necessary to comply with state regulatory requirements, Internal Revenue Service ("IRS") requirements or other federal requirements.

We may eliminate Sub-accounts, restrict or prohibit additional allocations to certain Sub-accounts, or substitute one or more new underlying mutual funds or portfolios for the one in which a Sub-account is invested. Substitutions may be necessary if we believe an underlying mutual fund or portfolio no longer suits the purpose of the Annuity. This may happen due to a change in laws or regulations, or a change in the investment objectives or restrictions of an underlying mutual fund or portfolio, or because the underlying mutual fund or portfolio is no longer available for investment, or for any other reason. We would obtain any prior approval as required by any applicable law.

# EXHIBIT B-1 - PIPEs

**THE PRUDENTIAL SERIES FUND**
SP International Growth Portfolio
Global Portfolio

*Supplement dated December 2, 2013*
*to the current Summary Prospectus, Prospectus and Statement of Additional Information (SAI)*

shareholders, NVDR holders cannot be involved in company decision-making. NVDRs are designed for use in the Thailand securities market. Investments in NVDRs involve certain risks unique to foreign investments. These risks are set forth in the section entitled "Foreign and Emerging Markets Risk" above.

**Options**—A call option on stock is a short-term contract that gives the option purchaser or "holder" the right to acquire a particular equity security for a specified price at any time during a specified period. For this right, the option purchaser pays the option seller a certain amount of money or "premium" which is set before the option contract is entered into. The seller or "writer" of the option is obligated to deliver the particular security if the option purchaser exercises the option. A put option on stock is a similar contract. In a put option, the option purchaser has the right to sell a particular security to the option seller for a specified price at any time during a specified period. In exchange for this right, the option purchaser pays the option seller a premium. Options on debt securities are similar to stock options except that the option holder has the right to acquire or sell a debt security rather than an equity security. Options on stock indexes are similar to options on stocks, except that instead of giving the option holder the right to receive or sell a stock, it gives the holder the right to receive an amount of cash if the closing level of the stock index is greater than (in the case of a call) or less than (in the case of a put) the exercise price of the option. The amount of cash the holder will receive is determined by multiplying the difference between the index's closing price and the option's exercise price, expressed in dollars, by a specified "multiplier." Unlike stock options, stock index options are always settled in cash, and gain or loss depends on price movements in the stock market generally (or a particular market segment, depending on the index) rather than the price movement of an individual stock.

**Participation Notes (P-Notes)**—P-Notes are a type of equity-linked derivative which generally are traded over-the-counter. Even though a P-Note is intended to reflect the performance of the underlying equity securities, the performance of a P-Note will not replicate exactly the performance of the issuers or markets that the P-Note seeks to replicate due to transaction costs and other expenses. Investments in P-Notes involve risks normally associated with a direct investment in the underlying securities. In addition, P-Notes are subject to counterparty risk, which is the risk that the broker-dealer or bank that issues the P-Notes will not fulfill its contractual obligation to complete the transaction with a Fund.

**Prepayment**—Debt securities are subject to prepayment risk when the issuer can "call" the security, or repay principal, in whole or in part, prior to the security's maturity. When the Portfolio reinvests the prepayments of principal it receives, it may receive a rate of interest that is lower than the rate on the existing security, potentially lowering the Portfolio's income, yield and its distributions to shareholders. Securities subject to prepayment may offer less potential for gains during a declining interest rate environment and have greater price volatility. Prepayment risk is greater in periods of falling interest rates.

**Private Investments in Public Equity (PIPEs)**—A PIPE is an equity security in a private placement that are issued by issuers who have outstanding, publicly-traded equity securities of the same class. Shares in PIPEs generally are not registered with the SEC until after a certain time period from the date the private sale is completed. This restricted period can last many months. Until the public registration process is completed, PIPEs are restricted as to resale and the Fund cannot freely trade the securities. Generally, such restrictions cause the PIPEs to be illiquid during this time. PIPEs may contain provisions that the issuer will pay specified financial penalties to the holder if the issuer does not publicly register the restricted equity securities within a specified period of time, but there is no assurance that the restricted equity securities will be publicly registered, or that the registration will remain in effect.

**Real Estate Investment Trusts (REITs)**—A REIT is a company that manages a portfolio of real estate to earn profits for its shareholders. Some REITs acquire equity interests in real estate and then receive income from rents and capital gains when the buildings are sold. Other REITs lend money to real estate developers and receive interest income from the mortgages. Some REITs invest in both types of interests.

**Repurchase Agreements**—In a repurchase transaction, the Portfolio agrees to purchase certain securities and the seller agrees to repurchase the same securities at an agreed upon price on a specified date. This creates a fixed return for the Portfolio.

67

the Prospectus of the Fund

## EXHIBIT B-2a

 **Prudential**

**Prudential Annuities**
A Business of Prudential Financial, Inc.
P.O. Box 7960

December 8, 2011

MICHAEL H WU
138 STABLEFORD DR
GLEN ELLYN IL 60137-3216

Contract Owner: Michael H. Wu
Joint Owner: Christine T. Wu
Contract Number: E1028928

Dear Mr. Wu:

I am writing in response to your email of December 1, 2011, regarding your concerns with the allocations on the above referenced annuity contract.

You have the Spousal Highest Daily Lifetime 6 Plus (SHD6 Plus) living benefit. When this benefit is elected, the entire contract value be invested according to a required allocation methodology or according to the Custom Portfolio Program. This benefit contains a proprietary formula designed to mitigate the financial risks incurred in providing the guarantees under this benefit.

The formula monitors the contract value daily and, only when specified by the formula, systematically transfers amounts between the Permitted Sub-accounts and the AST Investment Grade Bond Portfolio. Specifically, each business day, the formula monitors fluctuations in the variable contract value, the projected Annual Income Amount, and other factors, relative to certain "reallocation triggers" to determine whether contract value must be transferred to or from the AST Investment Grade Bond Portfolio. While you are not notified when the contract reaches a reallocation trigger, you will receive a confirmation statement indicating the transfer of a portion of the contract value either to or from the AST Investment Grade Bond Portfolio.

Additionally, you have a rebalancing program that is only available to clients with certain living benefits. The rebalancing program is intended to increase our investment flexibility with respect to contracts enrolled in these optional benefits by allowing them to create a customized asset allocation portfolio. The rebalancing program will automatically rebalance on the benefits "quarterversary" basis according to the most recent allocation under the program established on the contract.

Under the rebalancing program a minimum of 20% of the funds not invested in the Investment Grade Bond must be allocated between certain funds such as AST Lord Abbett Core Fixed Income, AST PIMCO Total Return Bond, AST Western Asset Core Plus Bond, AST Prudential Core Bond Portfolio, and AST Neuberger Berman Core Bond Portfolio. You may allocate more than 20% but no less than the allowed 20%. The 20% may be all in one of the above funds or split between them.

In your annuity contract and prospectus you were informed of how the optional living benefits work in regards to the transfers to and from the AST Investment Grade Bond Portfolio and/or other optional Custom Portfolio Program. When you signed your application, you authorized us to make these transfers on your annuity contract. Therefore, we are unable to comply with your request to restore your portfolio to the funds you were invested in as of July 20, 2011.

Variable annuities are issued by Pruco Life Insurance Company (in New York, by Pruco Life Insurance Company of New Jersey) and fixed annuities are issued by The Prudential Insurance Company of America, all located in Newark, NJ. Annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial companies and each is solely responsible for its own financial condition and contractual obligations.

## EXHIBIT B-2a

Kindly note, the SHD6 Plus benefit can be canceled at any time upon your request while there is remaining account value in the contract. Upon cancellation, we will remove the benefit from your contract and prorate the charge for the benefit. Any guarantees under this benefit will be terminated. If you cancel this benefit you would be able to choose from a range of investment options available under your product. Any guarantees under this benefit would be terminated.

I understand your frustration with the volatile market we are enduring. However, variable annuities may respond to fluctuations within the market. Because of this, your account may earn money as well as lose money. As with any investment, there is a certain degree of risk, and there is no guarantee that past performance is indicative of future results.

We regret any dissatisfaction you may have experienced regarding the benefit fund transfers, if the investment performance of your annuity contract has not met your expectations, as well as any confusion or inconvenience this entire matter may have caused. Quality service is our number one priority and we appreciate you bringing your concerns to our attention.

If you have questions, please contact your financial professional or our Annuity Service Center at (888) 778-2888. Representatives are available to assist you Monday through Thursday between 8:00 a.m. and 7:00 p.m., and Friday between 8:00 a.m. and 6:00 p.m. Eastern Time. You may also obtain additional information on our website, www.prudential.com. Thank you for choosing Prudential Annuities for your financial needs.

Sincerely,

Brooke Davis

Brooke Davis
Senior Customer Service Representative

# EXHIBIT B-2b

Highest Daily Lifetime℠ 6 Plus Income Benefit



Your Best Day Can Last A Lifetime.

Optional benefits are offered under variable annuities issued by Pruco Life Insurance Company (in New York, issued by Pruco Life Insurance Company of New Jersey).
This material must be preceded or accompanied by the current product prospectus and the applicable variable annuity product summary cards.

ANNUITIES:
NOT FDIC OR GOVERNMENT AGENCY INSURED | MAY LOSE VALUE | NOT BANK OR CREDIT UNION GUARANTEED

 **Prudential**

Page 1 of 2

0169561-00003-00   Ed. 03/2010

# **EXHIBIT B-2b**

## How We Manage Your Guarantee

At Prudential Annuities, we pride ourselves on being an innovator in guaranteed income solutions for retirement. That spirit of innovation is also reflected in our approach to managing your guarantee. When you elect HD Lifetime 6 Plus, your annuity will be monitored on a daily basis by a predetermined mathematical formula. This formula helps manage your guarantee through all market cycles by determining if funds should be transferred into or out of the AST Investment Grade Bond Portfolio ("Bond Portfolio").

The primary driver of transfers to and from the Bond Portfolio is the difference between your actual account value and your Protected Withdrawal Value. Therefore, during periods when your annuity's performance is poor, the formula determines if account value should

be transferred from your chosen investment options to the Bond Portfolio. When your annuity's performance improves, the formula then determines if account value should be transferred back to your chosen investment options.

The specific amounts transferred depend on factors unique to your individual annuity, including the length of time you've owned the benefit and the amount you have invested. Also factored in are any additional purchase payments made and any withdrawals taken from the annuity.

For more details on how your guarantee is managed, refer to page 14.

### Transfers Are Unique to Your Annuity.



# EXHIBIT B-3

 Prudential

## Judy Rice receives lifetime achievement award from Fund Industry Intelligence

NEWARK, N.J., April 09, 2012 - Prudential Investments Chairman, Judy Rice was recently honored with a lifetime achievement award at Fund Industry Intelligence's 19th Annual Mutual Fund Industry Awards. Prudential Investments is the mutual fund family of Prudential Financial, Inc. (NYSE: PRU) and offers funds across a range of asset classes and sectors, including equity, fixed income, real estate and specialty securities.

Rice has been recognized among the industry's most influential executives. She has long been an advocate for diversity through her leadership in the National Association of Female Executives, and through her leadership to help create The Gateway to Leadership Program in partnership with the Money Management Institute.

While at Prudential, she launched one of the industry's first separately managed account businesses. She also led Prudential's effort to convert its mutual fund distribution platform from a proprietary channel to primarily third-party distribution through an overhaul of the company's infrastructure, retaining and attracting talent, and changing the mix of Prudential's investments business. During her tenure, the company's net flow ranking, as determined by Simfund climbed from 575 in 2008 to 18 at the end of 2011, while the distribution team increased to 60 wholesalers from 22 during that same period. Rice, a 20-year company veteran was named chair of Prudential Investments in January and will retire at the end of the year.

"Judy's positive and sustained impact on the improvement of our retail mutual fund business could never be overstated," said Charlie Lowrey, executive vice president and COO, U.S. Businesses. "Her leadership and advocacy for diversity in the workplace and for making the industry more accessible to women has been equally as impressive, so I can't think of anyone who is more deserving of this honor," Lowery added.

Mutual fund investing involves risk. Some mutual funds have more risk than others. The investment return and principal value will fluctuate and shares when sold may be worth more or less than the original cost.

**Consider a fund's investment objectives, risks, charges, and expenses carefully before investing. The prospectus and summary prospectus, contain this and other information about the fund. Contact your financial professional for a prospectus and summary prospectus. Read them carefully before investing.**

Mutual funds are distributed by Prudential Investment Management Services LLC, a Prudential Financial company and member SIPC. Prudential Investments, Prudential, the Prudential logo, and the Rock symbol are service marks of Prudential Financial, Inc., and its related entities, registered in many jurisdictions worldwide.

Prudential Financial, Inc. (NYSE: PRU), a financial services leader with approximately $901 billion of assets under management as of December 31, 2011, has operations in the United States, Asia, Europe, and Latin America. Prudential's diverse and talented employees are committed to helping individual and institutional customers grow and protect their wealth through a variety of products and services, including life insurance, annuities, retirement-related services, mutual funds and

investment management. In the U.S., Prudential's iconic Rock symbol has stood for strength, stability, expertise and innovation for more than a century. For more information, please visit http://www.news.prudential.com/

0222360-00001-00

# EXHIBIT B-4

**BOARD OF TRUSTEES**

The Board of Trustees oversees the actions of Prudential Investments LLC (PI), the subadvisers and the distributor and decides on general policies. The Board also oversees the Fund's officers who conduct and supervise the daily business operations of the Fund.

**INVESTMENT MANAGER**

PI, a wholly-owned subsidiary of Prudential Financial, Inc., serves as the overall investment manager for the Fund. PI is located at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey 07102. PI and its predecessors have served as manager and administrator to investment companies since 1987. As of December 31, 2012, PI served as the investment manager to all of the Prudential U.S. and offshore investment companies, and as manager or administrator to closed-end investment companies, with aggregate assets of approximately $194.7 billion.

The Fund uses a "manager-of-managers" structure. Under this structure, PI is authorized to select (with approval of the Fund's independent trustees) one or more subadvisers to handle the actual day-to-day investment management of each Portfolio. PI monitors each subadviser's performance through quantitative and qualitative analysis, and periodically reports to the Fund's Board of Trustees as to whether each subadviser's agreement should be renewed, terminated or modified. PI also is responsible for allocating assets among the subadvisers if a Portfolio has more than one subadviser. In those circumstances, the allocation for each subadviser can range from 0% to 100% of a Portfolio's assets, and PI can change the allocations without prior notice and without board or shareholder approval. Any such changes will be reflected in the next annual update to the prospectus. The Fund will notify contract owners of any new subadviser or any material changes to any existing subadvisory agreement.

A discussion regarding the basis for the Board's approval of the Fund's investment management and subadvisory agreements is available in the Fund's semi-annual report (for agreements approved during the six-month period ended June 30), and in the Fund's annual report (for agreements approved during the six-month period ended December 31).

**INVESTMENT MANAGEMENT FEES**

Set forth below are the total effective annualized investment management fees paid (as a percentage of average net assets) by each Portfolio of the Fund to PI during 2012:

| | |
|---|---|
| Conservative Balanced | .55% |
| Diversified Bond Portfolio | .40% |
| Equity | .45% |
| Flexible Managed | .60% |
| Global | .75% |
| Government Income | .40% |
| High Yield Bond | .55% |
| Jennison | .60% |
| Money Market | .17% |
| Small Capitalization Stock | .40% |
| Stock Index | .30% |
| Value | .40% |

**Notes to Investment Management Fees Table:**

In order to support the income yield, PI has voluntarily agreed to limit the management fees of the Money Market Portfolio such that the 1-day annualized yield (excluding capital gain or loss) does not fall below 0.00%. Prior to July 1, 2012, PI had voluntarily agreed to limit the management fees of the Money Market Portfolio such that the 1-day annualized yield (excluding capital gain or loss) did not fall below 0.02%. Prior to March 2, 2010, that threshold was 0.05%. The waiver is voluntary and may be modified or terminated by PI at any time without notice.

PI has voluntarily agreed to waive a portion of its management fee equal to an annual rate of 0.05% of the average daily net assets of the Stock Index Portfolio. The waiver is voluntary and may be modified or terminated by PI at any time without notice.

# EXHIBIT B-5

## Item 1 – Cover Page

## Prudential Investments LLC

100 Mulberry Street, Gateway Center Three, Newark, NJ 07102

(973) 367 – 3321

www.prudential.com/investments

November 12, 2012

This Brochure provides information about the qualifications and business practices of Prudential Investments LLC. If you have any questions about the contents of this Brochure, please contact us at (973) 367 – 3321 or valerie.simpson@prudential.com. Information in this Brochure has not been approved or verified by the United States Securities and Exchange Commission (SEC) or by any state securities authority.

Additional information about Prudential Investments LLC also is available on the SEC's website at www.adviserinfo.sec.gov.

Prudential Investments LLC is an investment adviser registered with the SEC. Registration of an investment adviser does not imply any level of skill or training.

i

# EXHIBIT B-5

**Item 3 - Table of Contents**

## Contents

Item 1 – Cover Page..................................................................................................... i

Item 2 – Material Changes ......................................................................................... ii

Item 3 -Table of Contents........................................................................................... iii

Item 4 – Advisory Business ......................................................................................... 1

Item 5 – Fees and Compensation .............................................................................. 9

Item 6 – Performance-Based Fees and Side-By-Side Management.......................... 11

Item 7 – Types of Clients ............................................................................................ 11

Item 8 – Methods of Analysis, Investment Strategies and Risk of Loss ................... 11

Item 9 – Disciplinary Information .............................................................................. 11

Item 10 – Other Financial Industry Activities and Affiliations.................................. 12

Item 11 – Code of Ethics, Participation or Interest in Client Transactions & Personal Trading . 13

Item 12 – Brokerage Practices ................................................................................... 13

Item 13 – Review of Accounts .................................................................................... 14

Item 14 – *Client* Referrals and Other Compensation ............................................... 14

Item 15 – Custody ...................................................................................................... 15

Item 16 – Investment Discretion ............................................................................... 15

Item 17 – Voting *Client* Securities............................................................................. 15

Item 18 – Financial Information ................................................................................. 16

iii

Source: http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=161057

# EXHIBIT B-5

A. *Research Services on Funds and Managers*

1. Description of Research Services.

PI, through its Strategic Investment Research Group (SIRG) division, generally uses its proprietary **10 Attribute Model** to identify, evaluate, select, and monitor non-affiliated investment advisers (managers) and mutual funds.

PI employs a team of experienced and specialized analysts and management who devote their full attention to knowing and understanding the participants in the global money management community. The manager evaluation process is a rigorous approach that captures both qualitative and quantitative attributes using screening techniques, questionnaires and analytical assessments, interviews, on-site visits at PI's discretion, and on-going monitoring of portfolio performance and holdings. This process is applied to the following ten distinct areas:

(i)     investment team talent, experience, and quality
(ii)    investment team stability and motivation/incentive
(iii)   investment team's experience in working together
(iv)    quality of investment process and how well it is implemented
(v)     quality and utilization of research and judgment
(vi)    performance
(vii)   trading management and skill
(viii)  quality of the firm's management and ownership structure
(ix)    client servicing
(x)     compliance and ethics (conducted by PI Compliance)

To accomplish this analysis, PI employs advanced technological tools, including performance analytics, database-screening software, and proprietary reports. These tools provide returns-based style analyses and security-based attribution analyses, as well as data on individual securities, markets, and market benchmarks. *Quantitative evaluation includes a database records scan to identify those managers who meet the investment mandate's definitions for both asset class and investment management style. The resulting list is scanned for identified threshold characteristics such as firm size, assets (in the style) under management, length and quality of track record, portfolio manager (or team) tenure, and service capability.*

PI ranks managers using its proprietary **Fund Score** *quantitative measure* that incorporates two key metrics: *performance consistency* relative to the category peer group, and *risk-adjusted performance* as measured by its proprietary *Information Ratio.*

The performance consistency measure is based on the average decile ranking for 12-month rolling returns across various time periods. The Information Ratio is a measure that seeks to summarize the risk-adjusted performance of a portfolio relative to a specific benchmark over various time periods.

2

## EXHIBIT B-5

performance include, but are not limited to, significant organizational changes, portfolio manager changes, or changes to the investment management team. Firms experiencing these and other types of changes may receive further scrutiny, with a note to the field (referred to as a "Worth Knowing").

Managers may be subject to *enhanced scrutiny* depending on the investment performance of assets directly managed by the manager or the occurrence of an event at the firm that might have a material adverse effect on the manager. Items triggering enhanced scrutiny may include underperformance due to poor security selection, portfolio manager departures, senior management turnover, style drift, etc. Managers within this area receive an increased level of scrutiny, as SIRG's analysts seek to further understand the nature of the change and the potential impact on portfolio performance. Depending upon the platform, this enhanced scrutiny may be referred to as "Watch."

On a quarterly basis, PI publishes its Economic Outlook, Market Outlook and Investment Strategy, and Performance Review. These are made available to affiliated, and unaffiliated third-party, sponsors of managed account wrap platforms and mutual fund non-discretionary wrap programs, which are described in more detail below.

*Manager Termination or Addition*

PI, through its SIRG division, may recommend that a manager be terminated or replaced for a number of reasons. Most commonly, SIRG recommends the removal of a manager due to sub-standard investment performance over a period of time. In this case, the manager might be replaced by a new manager, or, if another manager for that portfolio is deemed to have superior performance in that asset class, the assets managed by the manager being terminated may be allocated to such other manager.

 In addition, SIRG may recommend the termination of a manager when the individual portfolio manager who is primarily responsible for the day-to-day management of a portfolio or fund moves from one firm to another firm and SIRG believes it is appropriate to have the investment management mandate follow that individual or simply no longer believes it is in the best interests of the portfolio or fund for it to continue to be managed by the manager after that individual portfolio manager has left such firm.

Furthermore, SIRG may recommend the termination of a manager when the manager undergoes a "change in control" that results in an assignment and termination of the applicable advisory or subadvisory agreement. Under these circumstances, SIRG may decide that it is not advisable to continue the relationship with the surviving firm.

In addition, SIRG may recommend the termination of a manager when they believe a change in investment style (e.g., change from value manager to growth manager) for the portfolio is warranted.

Also, SIRG may recommend the addition of a manager to a portfolio or fund without a corresponding termination/replacement recommendation to obtain further diversification

4

## EXHIBIT B-5

for that portfolio or fund or to address capacity constraints affecting the existing subadviser(s) for that portfolio.

SIRG's recommendations will be made to the internal committee for the product. Once the committee reaches its determination, the committee forwards its recommendation to the client, who ultimately decides on the status of the manager in its program. If the committee's recommendation differs from the SIRG recommendation, clients will be alerted by the committee that the SIRG recommendation differs. Clients range from internal product managers to external financial institutions.

LSV, Marsico, TRPA, and WBC are external financial institutions

*Managing Conflicts Related to Flow of Information between Business Units and Research Personnel*

PI maintains policies designed to regulate the business relationships and flow of information between its business units and the research personnel who are producing independent analysis for those business units on managers or subadvisers currently in the Programs, or being considered for inclusion in, or termination from the Programs.

Specifically, in order to maintain the independent nature of their research, the policy generally prohibits the passing of information relating to the compensation arrangements of individual managers or subadvisers from PI's business units to its SIRG research personnel.

Furthermore, in all business dealings, the policy provides guidance with respect to situations whereby sales and business personnel are placed in positions of influence over research personnel by virtue of reporting line, committee structure or otherwise.

2.   Research Provided to Sponsors of Managed Account Wrap Platforms

We provide Managed Account Platform Services (Platform Services) to affiliated, and unaffiliated third-party, bank and broker-dealer sponsors of wrap fee separately managed accounts (SMAs), unified managed accounts (UMAs), and mutual fund asset allocation programs (Programs) designed to assist the sponsors in providing such Programs to clients of sponsors.

This Brochure describes the Platform Services we provide to sponsors that are research services. Other Platform Services are technology-related and are not described in this Brochure. Research services include:

(i) research, timely information, and recommendations regarding the qualifications, investment philosophies, policies, and performance of the investment managers made available to the sponsor through our Managed Account Platform, and such managers' selected investment strategies;

(ii) information regarding the qualifications, investment philosophies, policies, and performance of certain investment subadvisers that provide investment advice to

5

## EXHIBIT B-5

3. Research Provided to Insurance Company Separate Accounts of Affiliates

PI provides research to affiliates concerning the selection of investment managers for certain insurance company separate accounts for use in connection with various products, as described below.

a. *Group Life Insurance*. PI provides research to affiliated insurance companies, including The Prudential Insurance Company of America (PICA), concerning the selection of investment managers for certain separate accounts for use in connection with registered *group universal variable life insurance* (GVUL) and *other group insurance variable products* such as PruBenefit Select. These products permit allocations of contract values to unaffiliated mutual funds, which are known as variable insurance trusts or VITs. The affiliated insurance companies enter into participation agreements with VITs in order to purchase shares of the VITs. PI provides oversight of the VITs. PI's oversight services include (i) monitoring fund performance, style and market cap consistency, and (ii) monitoring firm stability, firm ownership and composition of the portfolio management team. Because insurance company separate accounts own shares in VITs, an SEC substitution order is required to replace VIT shares with another VIT.

② (see ¶9)

b. *Annuities*. PI provides research to affiliated insurance companies, including Prudential Annuities Life Assurance Corporation (PALAC), Pruco Life Insurance Company (Pruco Life) and Pruco Life Insurance Company of New Jersey (Pruco Life of New Jersey), concerning the selection of investment managers for certain separate accounts for use in connection with registered *individual and group variable annuity contracts*. The contracts permit allocations of contract values to VITs. VITs are described in the preceding paragraph.

① (see ¶16)

⑥

c. *Individual Life Insurance*. PI provides research to affiliated insurance companies, including Pruco Life, Pruco Life of New Jersey and Pramerica of Bermuda Life Assurance Company, Ltd., concerning selection of investment managers for certain separate accounts for use in connection with registered *individual variable life insurance policies*. The insurance policies permit allocations of contract values to VITs. VITs are described above.

d. *Retirement Products.* PI provides research to affiliated insurance companies, including Prudential Retirement Insurance and Annuity Company (PRIAC), concerning the selection of investment managers for certain separate accounts for use in connection with *retirement plans*. PI also provides research to PRIAC regarding VITs offered through group variable annuities sold to *retirement plans* and *IRAs*.

8

Source: http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=161057

## EXHIBIT B-5

In each instance, we provide recommendations to a separate account committee of the affiliated insurance company on the selection, termination, and replacement of investment managers for the separate accounts, based on our investment manager due diligence analysis that uses all or portions of our proprietary **10 Attribute Model** and Evaluation Process described above under "Description of Research Services." Services provided by us under these investment advisory agreements include manager search, due diligence review of the manager, recommendations, reporting, on-going evaluation and monitoring, and communications with the insurance company.

We receive a fee from the respective insurance company equal to our costs of providing the research services.

**PIPEs (see ¶4)**

4.   Research Services Provided to Affiliated Investment Adviser

We also provide certain services to Quantitative Management Associates LLC (QMA) in connection with its asset allocation strategies for mutual funds and other asset allocation products, including the selection of investment managers (both affiliated and unaffiliated) to manage the assets that QMA allocates to various asset classes.

**LSV, Marsico, TRPA, and WBC are the unaffiliated IMs**

B.   *Investment Manager for Offshore Investment Company Portfolios*

We provide investment management services to the Worldwide Investors Portfolio ("WIP"), a multi-series investment company with variable capital, organized under the laws of the Grand Duchy of Luxembourg as a SICAV.

Subject to the supervision of the Board of Directors of WIP, we are responsible for managing the investment operations and determining the composition of each series within WIP.

We have engaged our affiliates, Jennison Associates LLC (Jennison) and Prudential Investment Management, Inc. (PIM) as subadvisers to WIP, who are responsible for determining the investments or securities that are purchased, sold or retained.  We receive advice from Prudential International Investments, LLC, an affiliate, in recommending the subadvisers and series to be included within WIP.

**(7)**   As of December 31, 2011, WIP managed assets totaling $170,098,260.46 million on a discretionary basis.   We receive management fees for providing investment advisory services to WIP, based on an annual percentage of assets under management, that range from 0.50% to 1.25% of the average daily net assets of the relevant series.

**Item 5 – Fees and Compensation**

**Managed Account Wrap Program Fees, including**

9

# EXHIBIT B-5

We are required to disclose all material facts regarding any legal or disciplinary events that would be material to an evaluation of us or the integrity of our management. We do not have any events to disclose in response to this Item.

## Item 10 – Other Financial Industry Activities and Affiliations

*Affiliated Program Sponsor*

We are affiliated with Pruco Securities, LLC (File Number 801-52208) (Pruco). Pruco is dually registered with the SEC as an investment adviser and a broker-dealer. As an investment adviser, Pruco conducts business through its unit, Prudential Financial Planning Services (PFPS), and acts as the sponsor of two wrap fee advisory programs, namely PruChoice and Managed Assets Consulting Services (MACS), as well as offers fee-based financial planning services. As described in Item 4, we provide Platform Services (implementation and administration) to PFPS for PruChoice and MACS. Pruco, as a broker-dealer, offers brokerage services and engages in the business of selling variable life insurance, variable annuities, mutual funds, Section 529 College Savings Plans and other securities.

⑤ **PIMS is not a market center**

*Other Affiliates*

We are affiliated with Prudential Investment Management Services LLC (PIMS), a Delaware limited liability company, whose sole member is PIFM Holdco, LLC, the direct parent of PI. PIMS, a registered broker-dealer (File No. 8-36540), acts as clearing broker for mutual fund transactions associated with Pruco's wrap fee programs for which we provide Platform services.

The affiliated insurance companies to whom we provide research are described in Item 4.

We have related persons who are SEC-registered investment advisers and who may manage limited partnerships and limited liability companies who are not listed on Schedule D, Section 7.B of Part 1A of our Form ADV. Certain of these SEC-registered investment advisers are listed in Schedule D, Section 7.A of Part 1A of our Form ADV.

Information about the limited partnerships or limited liability companies managed by these SEC-registered advisers is listed in Section 7.B of the Schedule D of the respective adviser's Form ADV, which may be viewed at www.adviserinfo.sec.gov/IAPD.

Except where The Prudential Insurance Company of America or affiliated companies may be considered our clients, we do not solicit our clients to invest in any of these limited partnerships or limited liability companies.

We provide research with respect to the identification, selection and monitoring of (i) investment managers that are affiliated with us, and (ii) mutual funds managed and/or

12

## EXHIBIT B-5

advised by us or our affiliates. As described in response to Item 5, we may, therefore, have a conflict of interest in recommending or issuing research reports on investment managers that are affiliated with us and on mutual funds managed and/or advised by us or our affiliates. We believe SIRG's rigorous and disciplined research process mitigates this conflict.

**Item 11 – Code of Ethics, Participation or Interest in Client Transactions, and Personal Trading**

We maintain a code of ethics as required by applicable SEC rules. Our code of ethics requires employees to conduct business in an honest and forthright manner in accordance with the highest of ethical standards. In addition, the code of ethics requires employees to put client interests ahead of our own and disclose actual and potential meaningful conflicts of interest. The code of ethics incorporates our information barrier and personal securities trading policies that are described in greater detail below.

Our employees are required to report any violation of the code of ethics promptly to our chief compliance officer.

We will provide a copy of our code of ethics to clients or prospective clients upon request and without charge.

*Prudential Financial Information Barrier Policy and Personal Securities Trading Policy*

The code of ethics also incorporates the Prudential Financial Information Barrier Policy and Personal Securities Trading Policy, which are intended, among other things, to deter and prevent insider trading and contain detailed requirements with respect to information barriers pertaining to material nonpublic information, as well as restrictions on and reporting and monitoring of employees' personal securities trading.

As discussed above, we may recommend that our clients consider investment advisers that are affiliated with us, or consider mutual funds managed and/or advised by us or our affiliates.

**Item 12 – Brokerage Practices**

*Affiliated Brokers*     ④ They are not Plaintiffs' brokerage firms.

We are affiliated with several U.S.-registered broker-dealers including, but not limited to Pruco and PIMS. Such broker-dealer affiliates may act in certain capacities identified in Item 10. In this regard, one or more broker-dealer affiliates may effect transactions in the capacity of principal or agent on both sides of the transaction. Such transactions are

Citigroup Global Markets, Inc. ("CGMI"),                                  13
     the Broker-dealer of Plaintiffs,
          Is the Agent of Prudential.

Source: http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=161057

# EXHIBIT B-5

effected in accordance with regulatory requirements of the Advisers Act and the 1940 Act and any other applicable laws.

*Execution Services/Managed Account Wrap Platforms*

With respect to the sale of Platform Services, we may offer a list of custodian firms with which our current sponsors' clients maintain connectivity. This list excludes any affiliated broker-dealers, and is primarily for the purpose of expediting connectivity in the event that the sponsor's prospective client decides to participate in the sponsor's wrap platform. We do not benefit financially based on the executing and/or clearing broker selected.

### Item 13 – Review of Accounts

*Worldwide Investors Portfolio*

For purposes of this Brochure, we have discretionary investment management responsibility for Worldwide Investors Portfolio (WIP), an offshore investment company for which we are responsible for managing the investment operations and determining the composition of each series within WIP, subject to the supervision of the Board of Directors of WIP.

We receive advice from Prudential International Investments, LLC, an affiliate, in recommending the subadvisers and series to be included within WIP. We have engaged our affiliates, Jennison Associates LLC (Jennison) and Prudential Investment Management, Inc. (PIM) as subadvisers to WIP, who are responsible for determining the investments or securities that are purchased, sold or retained.

We provide ongoing review and monitoring of Jennison and PIM, as the subadvisers for WIP. We also review attribute-based performance monitoring which analyzes risk, style and stock selection. We provide various materials to the Board of WIP in quarterly board reports and periodic presentations to the Board by Jennison and PIM.

Investments made for WIP are also under the continuous supervision of the respective individual PIM or Jennison portfolio managers. Certain compliance functions are administered across subsidiary companies of Prudential Financial for those portfolio assets that are directly managed by affiliated subadvisers. On a quarterly basis, we monitor certain compliance functions that are administered at the subadviser level.

⑤

### Item 14 – *Client* Referrals and Other Compensation

14

# EXHIBIT B-6

 **Prudential**

**Prudential Annuities**
A Business of Prudential Financial, Inc.
P.O. Box 7960
Philadelphia, PA 19176
(888) 778-2888

May 14, 2012

MICHAEL WU
138 STABLEFORD DR
GLEN ELLYN IL 60137

**Contract Owner:** Michael Wu, Christine Wu
**Contract Number:** E1028928

Dear Mr. Wu:

I am writing in response to your recent emails regarding your above referenced contract. I appreciate your patience while we reviewed your concerns.

Your concerns have been previously addressed numerous times in our multiple letters to you. Prudential stands by its prior responses and reiterates unequivocally that it in no way participates in any so-called Ponzi schemes, and that no transfers under your Spousal Highest Daily Six (SHD6) optional living benefit constitute unauthorized transactions. The Benefit Fund Transfers as well as the benefit fees and program rebalances associated with the (SHD6) optional living benefit elected by you were clearly explained to you multiple times, both in our correspondence as well as the contract and prospectus. We have adequately and appropriately responded to you regarding your benefit related questions and concerns and, therefore, do not plan to comment any further on those same issues.

In your letter dated April 22, 2012, you raise a new issue referencing a page from the FINRA website that contains the following language, "In most cases, brokerage firms are required to provide customers with written notification of trade confirmations at or before completion of a transaction." In response, we note that Prudential Annuities is not a brokerage firm. As all annuity financial transactions are priced as of the close of business on the day in which they are received, transaction confirmations are produced and mailed the next business day, meeting the requirements of FINRA and the SEC. Prudential has provided you with timely confirmations of the automatic asset transfers made within your contract.

In response to your further comments and information regarding the dividends issue, we cannot speak to what you discussed with Neuberger Berman Management. However, any dividends paid within the underlying subaccounts are reinvested and reflected in the unit values of the subaccount. Please refer to our letter from March 20, 2012 for further explanation.

Our offer to cancel your contract and return to you the greater of your total purchase payment(s) less any withdrawals or the Account Value, without the imposition of any Contingent Deferred Sales Charges had a final deadline of May 1, 2012. You did not accept this offer, but instead made a counter-offer. In a further effort to resolve this matter, Prudential is prepared to agree to that portion of your counter-proposal, where Prudential will cancel your contract and return to you your Contract Value adjusted to reflect the amount it would have been had you never elected SHD6. This offer is outlined in the enclosed Settlement and Release Agreement (the "Agreement"), and it is $11,500 more than your contract value as of April 24, 2012.

Variable annuities are issued by Pruco Life Insurance Company (in New York, by Pruco Life Insurance Company of New Jersey) and fixed annuities are issued by The Prudential Insurance Company of America, all located in Newark, NJ. Annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial companies and each is solely responsible for its own financial condition and contractual obligations.

# EXHIBIT B-6

If you would like to accept this offer, please sign the Agreement in the presence of a witness, who also should sign the Agreement, and return it by June 8, 2012. Otherwise, the Agreement may no longer be accepted and this offer may no longer be available. Once we receive the signed Agreement by June 8, we will sign the Agreement and return a copy for your records.

Please note, however, Prudential cannot provide you with advice about the tax treatment as applied to your individual situation. You should consult with your tax advisors as to how the general tax information applies to your individual situation. Any taxable income is generally reportable to you and the IRS by Prudential and may be subject to withholding.

If you have questions, please contact your financial professional or our Annuity Service Center at (888) 778-2888. Representatives are available to assist you Monday through Thursday between 8:00 a.m. and 7:00 p.m., and Friday between 8:00 a.m. and 6:00 p.m. Eastern Time. You may also obtain additional information on our website, www. prudentialannuities.com. Thank you for choosing Prudential Annuities for your financial needs.

Sincerely,

Michael Weissberger
Senior Customer Service Representative

Enclosure

# Ex. B-7a – Daily Auto-rebalancing: What Prudential Says



**Prudential Says That:**

① When **the Last Stage 1** Ended

(i) **Your Chosen Investment Options** Have

X(i) + Y(i) of capital; and

(ii) **Bond Portfolio** Has

nothing

① When **this Stage 1** Ended

(i) **Your Chosen Investment Options** Have

X(i) of capital

+ Y(i) of non-capital; and

(ii) **Bond Portfolio** Has

Y(i) of Capital

**Plaintiffs' Question Is:**

Where Did the Y(i) of non-capital Come from?

The Answer Is on the Next Page.

# Ex. B-7b - Daily Auto-rebalancing: What Prudential Does



# Ex. B-8a - Quarterly Auto-rebalancing: What Prudential Says



**Prudential Says That:**

⓿ - When the Quarterversary Auto-rebalancing Starts, Your Chosen Investment Option(i) Has X(i) Shares, and

⓪ - When the Quarterversary Auto-rebalancing Ends, Your Chosen Investment Option(i) Has X'(i) Shares where i is the i-th Chosen Investment Options.

Plaintiffs' Question Is Where Did the X(i) – X'(i) Shares Go to? The Answer Is on the Next Page.

# Ex. B-8b - Quarterly Auto-rebalancing: What Prudential Does



**Legend:**

① - When this Stage 1 Ended (see Ex. B-7b)

② - When this Stage 2 Started

② - during this Stage 2

α - Rebalance between Investment Option(i): $X(i) + Y(i) = X'(i) + Y'(i)$ where i is the i-th Investment Option

β - Invest Investment Option(i) in Mutual Fund(i)

γ - Registration Mutual Fund(i) with the SEC: Buy -in? Or Embezzlement?

② - When this Stage 2 Ended

# EXHIBIT C-1

7997240 03093 E1028928 FC001

E1028928
PU
E-CC, E-AC

### Premier Retirement X Series
### Annuity Transaction Confirmation
### August 05, 2011

Page 2 of 4

## Investment Transaction Activity

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

08/05/2011  Transaction Type: Benefit Fund Transfer

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus.  Please refer to the "Your Benefit Values" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| **unregistered private placements** | AST Cohen & Steers Realty | (456.77414) | 11.45275 | ($5,231.32) |
| | AST Lord Abbett Core Fixed Income Port | (536.56140) | 11.56151 | ($6,203.46) |
| | AST Marsico Capital Growth | (508.46342) | 10.77578 | ($5,479.09) |
| | AST Neuberger Berman Mid Cap Growth | (474.47042) | 11.29474 | ($5,359.02) |
| | AST Small Cap Growth | (438.75873) | 11.93264 | ($5,235.55) |
| **"junk bonds"** | AST Investment Grade Bond | 2,418.43708 | 11.37447 | $27,508.44 |
| | **Transaction Total:** | | | **$0.00** |

Transactions in your variable annuity contract are priced at the end of the business day (generally 4 p.m. Eastern time) on the day the transaction was processed.

## Account Value as of August 05, 2011

| Variable Investments | # of Units | Unit Price | Value |
|---|---|---|---|
| AST Cohen & Steers Realty | 1,209.87438 | 11.45275 | $13,856.39 |
| AST Lord Abbett Core Fixed Income Port | 1,421.20997 | 11.56151 | $16,431.33 |
| AST Marsico Capital Growth | 1,346.78676 | 10.77578 | $14,512.68 |
| AST Neuberger Berman Mid Cap Growth | 1,256.74782 | 11.29474 | $14,194.64 |
| AST Small Cap Growth | 1,162.15813 | 11.93264 | $13,867.61 |
| AST Investment Grade Bond | 2,418.43708 | 11.37447 | $27,508.44 |
| **Total Investment Value** | | | **$100,371.09** |

Total Investment Value reflects all charges that have been imposed, as of this statement date, but does not include charges that may be imposed in the future.

NOTE:
On 8/5/2011, Prudential transferred $27,508 of Plaintiffs' contract value to VITs and $27,508 of "junk bonds" to Plaintiffs' account to defraud Plaintiffs' contract value.

## EXHIBIT. C-2. Attachment 17q7 of EXHIBIT. C-3

Michael H. Wu & Christine T. Wu                          Date: July 16, 2012
40 E 9th Street (#1805), Chicago, IL 60605

CHRISTOPHER HAGAN                          Contract Offered by: Pruco Life Insurance Company
PRUDENTIAL ANNUITIES                                       Contract Number: E1028928
P. O. BOX 7960
PHILADELPHIA, PA 19176

Dear Mr. Hagan,

**First**. We have received your letter dated June 15, 2012 [i.e., **Attachment 17a6. Letter from Christopher Hagan (061512)**].

**Second**. The key features of the SHD6 plus living benefits are: (1) capturing our annuity's highest daily value and (2) growing that value at an annual 6% compounded rate [Ref. **Attachment 11h. Highest Daily Lifetime 6 Plus Income Benefit (Partial)**]. Please advise us: (1) what is our contract base of 2011 based on your two key features, (2) what is our highest daily value in 2011, (3) when it happened, and (4) what is our contract base of 2012 based on your two key features?

**Third**. We can ask a grade school kid to show you, Brooke Davis, and Michael Weissberger that our 40% allocation fully meets your 20% minimum requirements of your Rebalancing Program. On the other side, can you show us the magic of your black box, i.e., the Predetermined Mathematical Formula, is entirely normal? You just tell us **WHAT**. We ask you HOW in question Q3a, **Attachment 17q3 Response to and Questions for Christopher Hagan (032712)**, which you do not answer yet.



**Figure 1. The Black Box of Two-sided, Self-hedging Prudential Benefit Fund Transfer.**

## EXHIBIT. C-2. Attachment 17q7 of EXHIBIT. C-3

Please show us that your magic box is entirely normal by telling us (1) HOW, which is already documented in Q3a, **Attachment 17q3**, as well as: (2) WHO, (3) WHEN (i.e., the TIMESTAMP on top of the transaction **DAY**), and (4) WHERE as shown in **Figure 1** above, where "**Junk Bonds**" is "**AST Investment Grade Bond Portfolio**".

**Fourth**. We are still waiting for: (1) your answers to our questions, which are documented in "**Attachment 17q3. Response to and Questions for Christopher Hagan (032712)**", (2) response from Angella Anderson [Ref. **Attachment 18. Letter from Prudential Policyowner Relations (022312)**], and (3) answers from Mr. Michael Weissberger to our questions, which are documented in "**Attachment 17q4. Response to and Questions for Michael Weissberger (041212)** ". (ps. **Attachment 17q4** is renamed from **Attachment 20q2** for the continuity purpose.

All our questions for Prudential Insiders are documented in underlying **Attachments 17q3** and **17q4**, which are the only topics we have interests to discuss with Prudential. We never have any interest to cancel our Prudential Annuity contract in your offer because Ms. Xiaomei (Linda) Wang of CGMI has promised us the 6% annually warrantee. So, please do not mention the expired offer again [Ref. **Attachment 12. Offer with Settlement and Release Agreement from Angella Anderson (012012)**]

**Finally**. We have spent more than 11 months to compile a comprehensive set of questions for Prudential Insiders and proposed a fair counter-offer for resolving this matter. When John Robert Strangfeld Jr. will apologize and accept our counter-offer, i.e., **Attachment 21. Our Counter-offer to Citigroup and Prudential (041212)**, without change to pay the debt? **Please remember that any representation to the contrary is a criminal offense according to Prudential Prospectus**.

Sincerely,

Michael H. Wu
atts.
Attachment 9. Correspondences with Richard Carbone
Attachment 10. Correspondences with Prudential On-line Service
Attachment 11h. Prudential Brochure: Highest Daily Lifetime 6 Plus Income Benefit (Partial)
Attachment 12. Offer with Settlement and Release Agreement from Angella Anderson (012012)
Attachment 17q3. Response to and Questions for Christophe Hagan (032712)
Attachment 17q4. Response to and Questions for Michael Weissberger (041212)
Attachment 17a6. Letter from Christopher Hagan (061512)
Attachment 18. Letter from Prudential Policyowner Relations (022312)
Attachment 21. Our Counter-offer to Citigroup and Prudential (041212)

## EXHIBIT C-3. Request for Particular Information (Rule 10b-10)

Date: Thu, 13 Feb 2014 14:03:03 -0600
Message-ID: <CAJY5vMNYO-4OVigffnPN9GeH_2BgiiVoq9xpm6Ab_KYvUX5-Yw@mail.gmail.com>
Subject: Re: Waiting for Your Answers to My Questions Dated July 16, 2012
From: Michael W <mhw2000usa@gmail.com>
To: Christopher Hagan <christopher.hagan@prudential.com>
Cc: "john.strangfeld" <john.strangfeld@prudential.com>,
        "mark.grier" <mark.grier@prudential.com>,
        "brooke.davis" <brooke.davis@prudential.com>,
        "richard.carbone" <richard.carbone@prudential.com>,
        judy.rice@prudential.com, christine.marcks@prudential.com,
        "steve.shine" <steve.shine@prudential.com>,
        timothy.cronin@prudential.com, timothy.knierim@prudential.com,
        "Ms. Elizabeth M. Murphy" <Rulecomments@sec.gov>,
        "Ms. Jennifer J. Johnson" <reg.comments@federalreserve.gov>,
        "Mr. John W. Walsh" <regs.comments@occ.treas.gov>,
        "Mr. Robert E. Feldman" <comments@fdic.gov>,
        "Mr. David A. Stawick" <VolckerRule@cftc.gov>,
        "scott.haggerty" <scott.haggerty@prudential.com>,
        InvestorRelations@nyx.com
        "Karen L. Barr" <karen.Barr@investmentadviser.org>,
        Richard.Ketchum@finra.org, david.tittsworth@investmentadviser.org,
        SchapiroM@sec.gov, CaseyK@sec.gov, WalterE@sec.gov, ParedesT@sec.gov,
        McHugJ@sec.gov, HuH@sec.gov, diFlorioC@sec.gov, talktosolis@dol.gov,
        letters@fortune.com,
        "staff.writers@wallstcheatsheet.com" <staff.writers@wallstcheatsheet.com>,
        **James.Papagiannis@finra.org**,
        "editors@wallstcheatsheet.com" <editors@wallstcheatsheet.com>,
        mschnitzel@iiintelligence.com, "luz.aguilar" <luz.aguilar@sec.gov>,
        cscott@iiintelligence.com, njardine@iiintelligence.com,
        swilson@iiintelligence.com, vbelitski@iiintelligence.com,
        smurray@iiintelligence.com, acullop@virginia.edu,
        eric.durant@prudential.com, edward.baird@prudential.com,
        "charlie.lowrey" <charlie.lowrey@prudential.com>,
        robert.denicola@prudential.com, robert.falzon@prudential.com,
        "michael.l.corbat" <michael.l.corbat@citi.com>,
        john.c.gerspach@citi.com, "chris.cralle" <chris.cralle@citi.com>,
        "Chief, Sean McKessy" <McKessyS@sec.gov>,
        Vikram Pandit <vikram.pandit@citi.com>,
        NJ Attorney General <AskConsumerAffairs@lps.state.nj.us>,
        Anna Lascurain <Anna.Lascurain@dol.lps.state.nj.us>,
        "Mr. Robin Webster" <consumer_complaints@ins.state.il.us>,
        "Cheryl G. Weiss" <cweiss@ilsos.net>,
        "Ramos, Caridad" <cramos@atg.state.il.us>,
        "Wang, Linda" <linda.wang@citi.com>,
        Angella Anderson <angella.anderson@prudential.com>,
        "Forde, Steven M" <steven.m.forde@citi.com>,
        Director Robert Cook <tradingandmarkets@sec.gov>,
        "michael.weissberger" <michael.weissberger@prudential.com>,
        "martin.cohen@cohenandsteers.com" <mcohen@cohenandsteers.com>,
        Janeen Whoolery <Janeen.Whoolery@EagleAsset.com>,
        ClientServices <Clientservices@LordAbbett.com>,
        MarsicoFunds <MarsicoFunds@umb.com>,
        donna.borgogelli@nb.com,
        AskConsumerAffairs AskConsumerAffairs <AskConsumerAffairs@dca.lps.state.nj.us>

## EXHIBIT C-3. Request for Particular Information (Rule 10b-10)

Mr. Hagan,

More than one year has passed since I sent you the letter dated July 16, 2012 (attached). Those questions documented in Figure 1 of the attachment relate only to "Benefit Fund Transfer" transactions, which are done during stage 1 of each benefit quarter. I add more questions for transactions, which are done at stage 2 on each benefit quarter, in this e-mail.

More specifically, who are those broker-dealer(s) who submitted and/or received PFI orders of prohibited "Benefit Fund Transfer" transactions?

When such broker-dealer(s) received PFI orders of those prohibited "Benefit Fund Transfer" transactions?

Who is the registered national securities exchanges who executed those prohibited transactions of "Benefit Fund Transfer"?

Who is the fund who priced the shares?

When the fund priced its shares?

Who conducted compliance review for those prohibited "Benefit Fund Transfer" paired trade transactions of unregistered variable insurance trusts ("VITs"), which consist of PFI hedge funds and mispriced PICA "junk bonds", between variable annuities individuals and Prudential Financial, Inc. ("PFI"), the proprietary variable annuities group, during stage 1 of each benefit quarter?

When PICA updated records and data in the books of the Prudential Series Fund ("the Fund") after those prohibited "Benefit Fund Transfer" transactions were reviewed and executed?

When underlying Mutual Fund Companies of the Advanced Series Trust ("the Trust") updated records and data in the books of the Trust after those prohibited "Benefit Fund Transfer" transactions were reviewed and executed?

Who is/are the broker-dealer(s) of those synthesized "defined benefit pension risk transfer" transactions submitted and received at stage 2 on each benefit quarter?

Who is the registered exchanges who executed those synthesized "defined benefit pension risk transfer" transactions submitted and received at stage 2 on each benefit quarter?

Who conducts compliance review of underlying registered mutual funds of the Advanced Series trust ("the Trust") between PICA and underlying Mutual Fund Companies at stage 2 on each benefit quarter?

# EXHIBIT C-3. Request for Particular Information (Rule 10b-10)

The requirements under § 240.10b-10 Confirmation of transactions that particular information be disclosed is not determinative of a broker-dealer's obligation under the general antifraud provisions of the federal securities laws to disclose additional information to a customer at the time of the customer's investment decision.

Please furnish the particular information to me at your earliest convenience.

Sincerely,


Michael Wu

Att.
Attachment 17q7. Response to and Questions for Christopher Hagan (071612)

# EXHIBIT C-4. the 3Q2011 Quarterly Statement (partial)

8045419 02503

E1Q489GS. FC

**Premier Retirement X Series**
**Annuity Statement**
**July 01, 2011 through September 30, 2011**

## Portfolio Detail [continued]

**VARIABLE INVESTMENTS [continued]**

| As of June 30, 2011 | # of Units | Unit Price | Portfolio Value |
|---|---|---|---|
| **Mid/Small Cap:** | | | |
| AST Neuberger Berman Mid Cap Growth | 1,320.46427 | 12.94326 | $17,091.11 |
| AST Small Cap Growth | 1,215.27391 | 14.11388 | $17,152.23 |
| **Special Equity:** | | | |
| AST T. Rowe Price Natural Resources | 3,201.06491 | 11.61940 | $37,194.45 |
| **Bond:** | | | |
| AST PIMCO Total Return Bond | 2,153.26903 | 10.55807 | $22,734.37 |
| | | **Total Variable Investments** | **$110,351.67** |

Withdrawals made prior to the statement date are reflected in the values shown above. The Maturity Date is the end of your Guarantee Period. The surrender value may change daily to reflect the investment performance of the Sub-Accounts in which you are invested and fluctuations in our current fixed rates. Our current fixed rates are sensitive to interest rate fluctuations in the market.

## Surrender Value Calculation as of September 30, 2011

| | |
|---|---|
| Ending Account Value | $94,854.54 |
| Surrender Charge [CDSC] | ($9,000.00) |
| Other Fees and Charges | ($224.70) |
| **Surrender Value\*** | **$85,629.84** |

* "Surrender Value" is the value of your Annuity that would have been available if you had surrendered this contract effective as of this statement date. It equals the "Ending Account Value" for the current period, less any applicable fees and charges and any other adjustments as shown above. Depending on your contract, the charges and adjustments include, but are not limited to: Contingent Deferred Sales Charge (CDSC), MVA, and other miscellaneous fee applicable recaptured bonus, any charges due for optional benefits provided by rider or endorsement, any applicable maintenance fee and any applicable Credit is recoverable upon surrender. The Surrender Value shown on this statement may increase or decrease prior to your next statement.

## Investment Transaction Activity

July 01, 2011 through September 30, 2011

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|
| 07/01/2011 Transaction Type: Reallocation | | | | |
| | AST Goldman Sachs Large-Cap Value Port | (1,433.91280) | 11.43172 | ($16,392.09) |
| | AST Neuberger Berman Mid Cap Growth | (1,320.46427) | 13.15297 | ($17,368.03) |
| | AST Small Cap Growth | (1,215.27391) | 14.35238 | ($17,442.07) |
| | AST PIMCO Total Return Bond | (2,153.26903) | 10.55753 | ($22,733.20) |
| | AST T. Rowe Price Natural Resources | (3,201.06491) | 11.71002 | ($37,484.53) |
| | AST High Yield | 3,997.54324 | 11.14884 | $44,567.97 |
| | AST Lord Abbett Core Fixed Income Port | 3,936.88072 | 11.32063 | $44,567.97 |
| | AST T. Rowe Price Global Bond | 2,089.21649 | 10.66619 | $22,283.98 |
| | **Total:** | | | **$0.00** |

# EXHIBIT C-4. the 3Q2011 Quarterly Statement (partial)

8045419 02503 E1028928

E1028928 FC
E-CC, E-AC

## Prudential

### Premier Retirement X Series
#### Annuity Statement
#### July 01, 2011 through September 30, 2011

Page 5 of 9

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|
| 07/18/2011 | Transaction Type: Benefit Fee | | | |

This transaction includes the benefit fees for the following Benefit(s):
Spousal Highest Daily Lifetime(SM) 6 Plus

| | | | | |
|---|---|---|---|---|
| | AST High Yield | (9.81229) | 11.16967 | ($109.60) |
| | AST Lord Abbett Core Fixed Income Port | (9.66340) | 11.40489 | ($110.21) |
| | AST T. Rowe Price Global Bond | (5.12719) | 10.65691 | ($54.64) |
| | **Total:** | | | **($274.45)** |

| 07/18/2011 | Transaction Type: Program Rebalance |  the quarterversary auto-rebalancing scheme | | |
|---|---|---|---|---|
| | AST Lord Abbett Core Fixed Income Port | (15.17332) | 11.40489 | ($173.05) |
| | AST High Yield | 6.69581 | 11.16967 | $74.79 |
| | AST T. Rowe Price Global Bond | 9.22031 | 10.65691 | $98.26 |
| | **Total:** | | | **$0.00** |

| 07/20/2011 | Transaction Type: Reallocation | | | |
|---|---|---|---|---|
| | AST High Yield | (3,994.42676) | 11.18379 | ($44,672.83) |
| | AST Lord Abbett Core Fixed Income Port | (1,954.27263) | 11.41417 | ($22,306.40) |
| | AST T. Rowe Price Global Bond | (2,093.30961) | 10.70369 | ($22,406.14) |
| | AST Cohen & Steers Realty | 1,666.64852 | 13.40795 | $22,346.34 |
| | AST Marsico Capital Growth | 1,855.25018 | 12.04492 | $22,346.34 |
| | AST Neuberger Berman Mid Cap Growth | 1,731.21824 | 12.90787 | $22,346.34 |
| | AST Small Cap Growth | 1,600.91686 | 13.95847 | $22,346.35 |
| | **Total:** | | | **$0.00** |

| 08/05/2011 | Transaction Type: Benefit Fund Transfer  ①  | | | |
|---|---|---|---|---|

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| | AST Cohen & Steers Realty | (456.77414) | 11.45275 | ($5,231.32) |
| | AST Lord Abbett Core Fixed Income Port | (536.56140) | 11.56151 | ($6,203.46) |
| | AST Marsico Capital Growth | (508.46342) | 10.77578 | ($5,479.09) |
| | AST Neuberger Berman Mid Cap Growth | (474.47042) | 11.29474 | ($5,359.02) |
| | AST Small Cap Growth | (438.75873) | 11.93264 | ($5,235.55) |
| | AST Investment Grade Bond | 2,418.43708 | 11.37417 | $27,508.44 |
| | **Total:** | | | **$0.00** |

capital *(annotation, left margin)*  
"junks" *(annotation, left margin)*

| 08/08/2011 | Transaction Type: Benefit Fund Transfer  ②  | | | |
|---|---|---|---|---|

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| | AST Cohen & Steers Realty | (337.51218) | 10.33459 | ($3,488.05) |
| | AST Lord Abbett Core Fixed Income Port | (396.46668) | 11.58062 | ($4,591.33) |
| | AST Marsico Capital Growth | (375.70572) | 9.97914 | ($3,749.22) |
| | AST Neuberger Berman Mid Cap Growth | (350.58854) | 10.39783 | ($3,645.36) |
| | AST Small Cap Growth | (324.20124) | 10.87775 | ($3,526.58) |



02503 8045419 008787 016350 00000X0005

# EXHIBIT C-4. the 3Q2011 Quarterly Statement (partial)

8045419 02503

E IQ8SQB, PC

Page 6 of 9

## Premier Retirement X Series
### Annuity Statement
### July 01, 2011 through September 30, 2011

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

**08/08/2011 Transaction Type: Benefit Fund Transfer [continued]**

| | | | | |
|---|---|---|---|---|
| | AST Investment Grade Bond | 1,667.88448 | 11.39200 | $19,000.54 |
| | **Total:** | | | **$0.00** |

**08/09/2011 Transaction Type: Benefit Fund Transfer** 

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (1,090.83488) | 11.42997 | ($12,468.21) |
| AST Cohen & Steers Realty | 216.32566 | 11.52725 | $2,493.64 |
| AST Lord Abbett Core Fixed Income Port | 214.18093 | 11.64268 | $2,493.64 |
| AST Marsico Capital Growth | 235.39074 | 10.59362 | $2,493.64 |
| AST Neuberger Berman Mid Cap Growth | 224.00425 | 11.13211 | $2,493.64 |
| AST Small Cap Growth | 215.66162 | 11.56279 | $2,493.65 |
| **Total:** | | | **$0.00** |

**08/15/2011 Transaction Type: Benefit Fund Transfer** 

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (742.37409) | 11.50354 | ($8,539.93) |
| AST Cohen & Steers Realty | 140.92129 | 12.12017 | $1,707.99 |
| AST Lord Abbett Core Fixed Income Port | 147.00961 | 11.61822 | $1,707.99 |
| AST Marsico Capital Growth | 157.65120 | 10.83398 | $1,707.99 |
| AST Neuberger Berman Mid Cap Growth | 146.91376 | 11.62580 | $1,707.99 |
| AST Small Cap Growth | 141.89793 | 12.03661 | $1,707.97 |
| **Total:** | | | **$0.00** |

**08/16/2011 Transaction Type: Benefit Fund Transfer** (5)

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (434.18657) | 11.54149 | ($5,011.16) |
| AST Cohen & Steers Realty | 83.09104 | 12.06183 | $1,002.23 |
| AST Lord Abbett Core Fixed Income Port | 85.95912 | 11.65938 | $1,002.23 |
| AST Marsico Capital Growth | 94.07404 | 10.65363 | $1,002.23 |
| AST Neuberger Berman Mid Cap Growth | 87.58493 | 11.44295 | $1,002.23 |
| AST Small Cap Growth | 85.08716 | 11.77898 | $1,002.24 |
| **Total:** | | | **$0.00** |

# EXHIBIT C-4. the 3Q2011 Quarterly Statement (partial)

8045419 02503 E1028928

E1028928, PC
X-CC, X-AC

 **Prudential**

Page 7 of 9

### Premier Retirement X Series
#### Annuity Statement
#### July 01, 2011 through September 30, 2011

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

08/18/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Cohen & Steers Realty | (369.20622) | 11.56045 | ($4,268.19) |
| AST Lord Abbett Core Fixed Income Port | (413.97905) | 11.69994 | ($4,843.53) |
| AST Marsico Capital Growth | (410.12832) | 10.00304 | ($4,102.53) |
| AST Neuberger Berman Mid Cap Growth | (383.82083) | 10.68522 | ($4,101.21) |
| AST Small Cap Growth | (360.17884) | 10.91505 | ($3,931.37) |
| AST Investment Grade Bond | 1,834.96893 | 11.57885 | $21,246.83 |
| **Total:** | | | **$0.00** |

08/29/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Investment Grade Bond | (860.62763) | 11.45679 | ($9,860.03) |
| AST Cohen & Steers Realty | 163.33943 | 12.07308 | $1,972.01 |
| AST Lord Abbett Core Fixed Income Port | 170.46862 | 11.56817 | $1,972.01 |
| AST Marsico Capital Growth | 183.92322 | 10.72192 | $1,972.01 |
| AST Neuberger Berman Mid Cap Growth | 167.59472 | 11.76654 | $1,972.01 |
| AST Small Cap Growth | 163.53377 | 12.05861 | $1,971.99 |
| **Total:** | | | **$0.00** |

09/16/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Investment Grade Bond | (435.28134) | 11.54242 | ($5,024.20) |
| AST Cohen & Steers Realty | 82.77919 | 12.13880 | $1,004.84 |
| AST Lord Abbett Core Fixed Income Port | 86.31986 | 11.64089 | $1,004.84 |
| AST Marsico Capital Growth | 91.72223 | 10.95525 | $1,004.84 |
| AST Neuberger Berman Mid Cap Growth | 83.82538 | 11.98730 | $1,004.84 |
| AST Small Cap Growth | 82.23876 | 12.21857 | $1,004.84 |
| **Total:** | | | **$0.00** |

09/22/2011 Transaction Type: Benefit Fund Transfer ⑨

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Cohen & Steers Realty | (327.82221) | 10.94453 | ($3,587.86) |
| AST Lord Abbett Core Fixed Income Port | (362.29367) | 11.77277 | ($4,265.20) |
| AST Marsico Capital Growth | (364.77619) | 10.19935 | ($3,720.48) |
| AST Neuberger Berman Mid Cap Growth | (339.57476) | 11.10162 | ($3,769.83) |
| AST Small Cap Growth | (321.36932) | 11.07878 | ($3,560.38) |
| AST Investment Grade Bond | 1,627.41416 | 11.61582 | $18,903.75 |
| **Total:** | | | **$0.00** |

02503 8045419 008788 016352 00004/00005

## EXHIBIT C-5. the 4Q2011 Quarterly Statement (partial)

8130484 00774 E1028928

 **Prudential**

X1028928 PC
XCC R-AC

Page 5 of 9

### Premier Retirement X Series
Annuity Statement
October 01, 2011 through December 31, 2011

Investment Transaction Activity          October 01, 2011 through December 31, 2011

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

10/03/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| capital | AST Cohen & Steers Realty | (204.97258) | 10.32421 | ($2,116.18) |
| | AST Lord Abbett Core Fixed Income Port | (226.52553) | 11.70367 | ($2,651.18) |
| | AST Marsico Capital Growth | (228.07798) | 9.60347 | ($2,190.34) |
| | AST Neuberger Berman Mid Cap Growth | (212.32070) | 10.47830 | ($2,224.76) |
| | AST Small Cap Growth | (200.93802) | 10.49871 | ($2,109.59) |
| "junks" | AST Investment Grade Bond | 979.15957 | 11.53239 | $11,292.05 |
| | Total: | | | $0.00 |

10/06/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (527.24861) | 11.43453 | ($6,028.84) |
| AST Cohen & Steers Realty | 110.05749 | 10.95582 | $1,205.77 |
| AST Lord Abbett Core Fixed Income Port | 104.15283 | 11.57693 | $1,205.77 |
| AST Marsico Capital Growth | 116.19494 | 10.37713 | $1,205.77 |
| AST Neuberger Berman Mid Cap Growth | 106.26286 | 11.34705 | $1,205.77 |
| AST Small Cap Growth | 104.25787 | 11.56517 | $1,205.76 |
| Total: | | | $0.00 |

10/14/2011 Transaction Type: Benefit Fund Transfer

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (483.23872) | 11.39143 | ($5,504.78) |
| AST Cohen & Steers Realty | 97.29388 | 11.31582 | $1,100.96 |
| AST Lord Abbett Core Fixed Income Port | 95.56803 | 11.52017 | $1,100.96 |
| AST Marsico Capital Growth | 99.43121 | 11.07258 | $1,100.96 |
| AST Neuberger Berman Mid Cap Growth | 92.18732 | 11.94264 | $1,100.96 |
| AST Small Cap Growth | 90.32339 | 12.18887 | $1,100.94 |
| Total: | | | $0.00 |

10/17/2011 Transaction Type: Benefit Fee

This transaction includes the benefit fees for the following Benefit[s]:
Spousal Highest Daily Lifetime[SM] 6 Plus

| | | | |
|---|---|---|---|
| AST Cohen & Steers Realty | (2.51125) | 11.02639 | ($27.69) |
| AST Lord Abbett Core Fixed Income Port | (2.69013) | 11.54962 | ($31.07) |
| AST Marsico Capital Growth | (2.75022) | 10.79913 | ($29.70) |
| AST Neuberger Berman Mid Cap Growth | (2.55384) | 11.67652 | ($29.82) |
| AST Small Cap Growth | (2.43639) | 11.84537 | ($28.86) |
| AST Investment Grade Bond | (11.49097) | 11.42810 | ($131.32) |
| Total: | | | ($278.46) |

007748130484 008759 012387 00003/00010

# EXHIBIT C-5. the 4Q2011 Quarterly Statement (partial)

8130484 00774

E1C2928. PC

## Premier Retirement X Series
### Annuity Statement
### October 01, 2011 through December 31, 2011

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|
| 10/17/2011 Transaction Type: Program Rebalance | *the quarterversary auto-rebalancing scheme* | | | |
| | AST Lord Abbett Core Fixed Income Port | (48.65701) | 11.54962 | ($561.97) |
| | AST Marsico Capital Growth | (8.72292) | 10.79913 | ($94.20) |
| | AST Neuberger Berman Mid Cap Growth | (11.50771) | 11.67652 | ($134.37) |
| | AST Cohen & Steers Realty | 54.08388 | 11.02639 | $596.35 |
| | AST Small Cap Growth | 16.39375 | 11.84537 | $194.19 |
| | **Total:** | | | **$0.00** |

10/24/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (543.08078) | 11.46242 | ($6,225.02) |
| AST Cohen & Steers Realty | 103.74862 | 12.00016 | $1,245.00 |
| AST Lord Abbett Core Fixed Income Port | 107.83450 | 11.54547 | $1,245.00 |
| AST Marsico Capital Growth | 111.39215 | 11.17673 | $1,245.00 |
| AST Neuberger Berman Mid Cap Growth | 101.67631 | 12.24474 | $1,245.00 |
| AST Small Cap Growth | 98.59374 | 12.62778 | $1,245.02 |
| **Total:** | | | **$0.00** |

10/28/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (585.52031) | 11.53685 | ($6,755.06) |
| AST Cohen & Steers Realty | 108.44779 | 12.45770 | $1,351.01 |
| AST Lord Abbett Core Fixed Income Port | 116.62010 | 11.58471 | $1,351.01 |
| AST Marsico Capital Growth | 117.61751 | 11.48647 | $1,351.01 |
| AST Neuberger Berman Mid Cap Growth | 108.26416 | 12.47883 | $1,351.01 |
| AST Small Cap Growth | 103.65615 | 13.03367 | $1,351.02 |
| **Total:** | | | **$0.00** |

11/21/2011 Transaction Type: Benefit Fund Transfer (15)

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Cohen & Steers Realty | (338.72430) | 11.42776 | ($3,870.86) |
| AST Lord Abbett Core Fixed Income Port | (329.94909) | 11.64319 | ($3,841.66) |
| AST Marsico Capital Growth | (349.56227) | 10.63553 | ($3,717.78) |
| AST Neuberger Berman Mid Cap Growth | (322.73662) | 11.61712 | ($3,749.27) |
| AST Small Cap Growth | (316.72568) | 11.70846 | ($3,708.37) |
| AST Investment Grade Bond | 1,641.92557 | 11.50353 | $18,887.94 |
| **Total:** | | | **$0.00** |

## EXHIBIT C-5. the 4Q2011 Quarterly Statement (partial)

8130484 00774 E1028928

 **Prudential**

E1028928_PC
E-CC_E-AC

Page 7 of 9

### Premier Retirement X Series
### Annuity Statement
### October 01, 2011 through December 31, 2011

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

11/30/2011 Transaction Type: Benefit Fund Transfer (16)

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Investment Grade Bond | (508.58436) | 11.49823 | (\$5,847.82) |
| AST Cohen & Steers Realty | 98.75138 | 11.84348 | \$1,169.56 |
| AST Lord Abbett Core Fixed Income Port | 100.76611 | 11.60668 | \$1,169.56 |
| AST Marsico Capital Growth | 104.73228 | 11.16714 | \$1,169.56 |
| AST Neuberger Berman Mid Cap Growth | 95.78275 | 12.21055 | \$1,169.56 |
| AST Small Cap Growth | 94.76291 | 12.34217 | \$1,169.58 |
| **Total:** | | | **\$0.00** |

12/16/2011 Transaction Type: Benefit Fund Transfer (17)

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Investment Grade Bond | (414.33137) | 11.64201 | (\$4,823.65) |
| AST Cohen & Steers Realty | 80.87009 | 11.92938 | \$964.73 |
| AST Lord Abbett Core Fixed Income Port | 82.37614 | 11.71128 | \$964.73 |
| AST Marsico Capital Growth | 89.94556 | 10.72571 | \$964.73 |
| AST Neuberger Berman Mid Cap Growth | 82.29357 | 11.72303 | \$964.73 |
| AST Small Cap Growth | 80.77861 | 11.94289 | \$964.73 |
| **Total:** | | | **\$0.00** |

Transactions in your variable annuity contract are priced at the end of the business day (generally 4 p.m. Eastern time) on the day the transaction was processed.

## Special Programs as of December 31, 2011

Program Rebalancing          Quarterly Rebalance of variable investment options.

Some special programs may not be available due to age requirements, minimum account value, or other optional programs selected.

## Primary Beneficiary Information

CHRISTINE T. WU                    MICHAEL H. WU

EXHIBIT C-6. Prudential Accumulatively Disgorged $45,515 between Two Consecutive Public Registrations in 2H2011

| Business Day (x) | Calendar Date | S&P 500 | | Projected PFI Market Cap | | | Contract Value → VITs | | Falsified Acct Value |
|---|---|---|---|---|---|---|---|---|---|
| | | Index | Day(x)'s – Day(0)'s | Up (%) | Up to (Index) | Consistency | Transfer | Sub-total | |
| 136 | 18-Jul-11 | 1,305.44 | 47.80 | 6.8 | 1343.16 | (37.72) | (Auto-rebalancing in 3Q) | | |
| 150 | 5-Aug-11 | 1,199.38 | (58.26) | 7.5 | 1351.96 | (152.58) | $27,508 | $27,508 | $99,368 |
| 151 | 8-Aug-11 | 1,119.46 | (138.18) | 7.55 | 1352.59 | (233.13) | $19,001 | $46,509 | $95,662 |
| 152 | 9-Aug-11 | 1,172.53 | (85.11) | 7.6 | 1353.22 | (180.69) | ($12,468) | $34,041 | n/a |
| 156 | 15-Aug-11 | 1,204.49 | (53.15) | 7.8 | 1355.74 | (151.25) | ($8,540) | $25,501 | n/a |
| 157 | 16-Aug-11 | 1,192.76 | (64.88) | 7.85 | 1356.36 | (163.60) | ($5,011) | $20,490 | n/a |
| 159 | 18-Aug-11 | 1,140.65 | (116.99) | 7.95 | 1357.62 | (216.97) | $21,247 | $41,737 | n/a |
| 166 | 29-Aug-11 | 1,210.08 | (47.56) | 8.3 | 1362.02 | (151.94) | ($9,860) | $31,877 | n/a |
| 179 | 16-Sep-11 | 1,216.01 | (41.63) | 8.95 | 1370.20 | (154.19) | ($5,024) | $26,853 | n/a |
| 183 | 22-Sep-11 | 1,129.56 | (128.08) | 9.15 | 1372.71 | (243.15) | $18,904 | $45,757 | n/a |
| 190 | 3-Oct-11 | 1,099.23 | (158.41) | 9.5 | 1377.12 | (277.89) | $11,292 | $57,049 | (Trough) |
| 193 | 6-Oct-11 | 1,164.97 | (92.67) | 9.65 | 1379.00 | (214.03) | ($6,029) | $51,020 | n/a |
| 199 | 14-Oct-11 | 1,224.58 | (33.06) | 9.95 | 1382.78 | (158.20) | ($5,505) | $45,515 | n/a |
| 200 | 17-Oct-11 | 1,200.86 | (56.78) | 10 | 1383.40 | (182.54) | (Auto-rebalancing in 4Q) | | |
| 205 | 24-Oct-11 | 1,254.19 | (3.45) | 10.25 | 1386.55 | (132.36) | ($6,225) | $39,290 | n/a |
| 209 | 28-Oct-11 | 1,285.09 | 27.45 | 10.45 | 1389.06 | (103.97) | ($6,755) | $32,535 | n/a |
| 225 | 21-Nov-11 | 1,192.98 | (64.66) | 11.25 | 1399.12 | (206.14) | $18,888 | $51,423 | n/a |
| 231 | 30-Nov-11 | 1,246.96 | (10.68) | 11.55 | 1402.90 | (155.94) | ($5,848) | $45,575 | n/a |
| 243 | 16-Dec-11 | 1,219.66 | (37.98) | 12.15 | 1410.44 | (190.78) | ($4,824) | $40,751 | n/a |

August

# EXHIBIT D. the Robust Capital Protection Framework

- **Group Insurance** reported pre-tax adjusted operating income of $208 million for the year, compared to $215 million a year ago.

- **Individual Life** reported pre-tax adjusted operating income of $517 million for the year, compared to $500 million a year ago.

One of the ways that we measure our aggregate success is through *total assets under management*, which were $901 billion as of year-end 2011, up from $784 billion from the previous year.

### International

Expanding our international operations is a vital component of our long-term strategy.

For more than 20 years, Prudential has achieved extensive growth and success in international insurance operations, and we remain committed to achieving growth in both new and existing markets, channels, and products that offer solid returns on our investment.

In Japan, a developed market with deep insurance product penetration, we see significant opportunity. Because Japan has an aging population and the world's largest pool of assets invested in low-return savings accounts, we see opportunity for retirement-oriented products. Accordingly, we believe in Japan's retirement market prospects and are positioned to invest for growth.

To this end, we built on our strategic acquisition of AIG Star and AIG Edison by completing the successful legal merger of those two distinct entities with our existing Gibraltar Life operations on January 1 of this year. This is an exceptional accomplishment, not only due to the merger's ambitious timeline, and not only because of its importance to our continued growth in Japan, but also in light of the extraordinary circumstances faced by all of our Japan-based businesses in the wake of the Tohoku earthquake and tsunami in March 2011.

The combination of resources will augment our service of the Japanese broad middle-income market, which is enhanced by our rapidly growing bank channel, our sizeable independent agent channel, and our valuable relationship with the Teachers' Association of Japan.

In China, a major emerging market where insurance penetration and density are still far below global average levels—an indication of vast growth potential—Prudential took two important steps this year to extend our presence. In April 2011, Prudential signed a definitive agreement with Fosun Group, a large privately owned holding company in China, to establish a private equity fund for the Chinese marketplace. In September 2011, Prudential and Fosun received regulatory approval to develop a life insurance joint venture to be headquartered in Shanghai.

### Building and Deploying Financial Strength

Prudential actively manages its capital, liquidity, and investment portfolio to retain financial strength as a competitive advantage, allowing the company to not only withstand but also compete effectively in a wide range of market conditions. Our investment portfolio remains of high quality and is broadly diversified.

As a result of prudent and proactive capital management, we are not capital constrained, which gives us the ability to pursue attractive acquisitions and act on organic opportunities to innovate and grow. Our 2011 dividend—the highest that Prudential has ever paid— was a demonstration of our financial strength and our commitment to return capital to our shareholders.

Our capital deployment strategy has also included share buybacks. Under an authorization by Prudential's Board of Directors issued in June 2011 to repurchase at management's discretion up to $1.5 billion of the company's outstanding Common Stock through June 2012, the company acquired 19.8 million shares of its Common Stock at a total cost of approximately $1.0 billion, representing the repurchases made during the second half of 2011. ③

In addition, we employ a robust capital protection framework to ensure availability of adequate capital under reasonably foreseeable stress scenarios. This framework is used to assess potential capital needs arising from market-related distress and identify sources of capital available to meet those needs.  ①

The strength and flexibility afforded by our financial position endows us with the freedom to pioneer new products and services that anticipate the evolving needs of our clients.

For example, one area where we are putting capital and innovation to work is the pension risk transfer market. Here, we have expanded our product platform to help clients meet pension funding requirements, thereby increasing the security of the promise that pension plans offer to participants around the world. In 2011, Prudential completed four pension risk transfer transactions, including its first longevity reinsurance transaction and the U.S.'s first pension plan risk transfer transaction utilizing a buy-in of a specially designed annuity product.  ②

Another product that differentiates us from our peers is our Highest Daily Lifetime Income benefit. We pioneered this innovative variable annuity living benefit in 2006.

### Engaging with Stakeholders

Further supporting our financial strength is appropriate, meaningful regulation of our industry and our company. We are active participants in the ongoing regulatory dialogue on the modernization and improvement of insurance regulation in the United States. We are constructively engaged with the Federal Reserve and the Treasury Department, with other stakeholders in

## EXHIBIT E-1. Grier's Statements in PRU Q4 2009 Earnings Call



Our gross variable annuity sales for the quarter amounted to $4.8 billion compared to $2.1 billion a year ago. Our highest daily or HD living benefit guarantees have provided us with a substantial competitive advantage in the variable annuity market. These products include an auto rebalancing feature that shifts customer funds to fixed income investments to protect account values and support our guarantees in market downturns.

We have completed our transition to our new HD 6 Plus living benefit product feature which was introduced in August. About $1 billion of the current quarter's sales, substantially all in the first month of the quarter, represented spillover sales of the earlier HD 6 product -- of the earlier product, HD 7 Plus. Significantly, monthly sales continued at a similar level in November and December suggesting that our new product is still attractive in the marketplace.

Our take-up rate for HD features, the percentage of eligible premiums where the customer has elected the benefit, was over 90% for the fourth quarter. The popularity of these features has driven the growth of our auto rebalancing book of business, reducing our risk profile and limiting our exposure to changes in hedging costs.

As of year-end about two-thirds of our account values with living benefits are subject to auto rebalancing compared to just over half of the account values a year earlier. The auto rebalancing algorithm is functioning as intended, returning customer funds to participate in market appreciation as account values become adequate to support our guarantees.                    (Ps. This Happens When the Market Upturns)

## EXHIBIT E-2. Grier's Statements in Q4 2010

**What Mark Brown Grier said during PFI 4Q 2010 Earnings Call held on February 10, 2011:**



All of the variable annuity living benefit features we offer today come packaged with an auto-rebalancing feature, where customer funds are reallocated to fixed income investments to support our guarantees in the event of market declines. Given the popularity of these features over the past several years, driven by our highest daily benefits, more than three quarters of our account values with living benefits at year end are subject to auto-rebalancing, reducing our risk profile and limiting our exposure to potentially volatile cost of hedging equity risk. Our auto-rebalancing algorithm has functioned well, producing net transfers of about $7 billion from auto-rebalanced fixed income investments to funds that clients have selected since the market trough in early 2009. As of year end, less than 12% of account values subject to auto-rebalancing remain in the designated fixed income accounts. Put another way, 88% of the account values for auto-rebalancing products are now in client-selected funds, providing participation in equity and fixed income markets. At the trough of the market, more than 3/4 of the account values were in auto-rebalance fixed income accounts.

Our gross rate of Annuity sales for the quarter amounted to $6.1 billion compared to $4.8 billion a year ago. Our highest daily products have fueled growth in each of our distribution channels and supported development of significant new relationships, especially in the bank channel, where quarterly sales passed the $1 billion mark for the first time and are up more than 70% over the year ago quarter.

# EXHIBIT E-3a. Strangfeld's Compensation for 2013

John Strangfeld (Age: 60)

## Profile

Mr. Strangfeld has served as CEO and President of Prudential Financial since January 2008 and Chairman of the Board since May 2008. Mr. Strangfeld is a Member of the Office of the Chairman of Prudential Financial and served as Vice Chairman of Prudential Financial from 2002 through 2007, overseeing the U.S. Insurance and Investments divisions. Prior to his position as Vice Chairman, Mr. Strangfeld held a variety of senior investment positions at Prudential, both within the U.S. and abroad.

## Prudential Financial Inc

### Compensation for 2013

| | |
|---|---|
| Salary | $1,400,000 |
| Bonus | $5,460,000 |
| Restricted stock awards | $3,371,094 |
| All other compensation | $87,923 |
| Option awards | $3,380,246 |
| Non-equity incentive plan compensation | $3,039,573 |
| Change in pension value and nonqualified deferred compensation earnings | $2,451 |
| **Total Compensation** | **$16,741,287** |

### Options Exercised for 2013

| | |
|---|---|
| Number of securities underlying options unexercisable | 247,094 |
| Shares acquired on exercise | 354,122 |

### Stock Ownership for 2014

| | |
|---|---|
| Number of shares owned | 315,122 |

# EXHIBIT E-3b. Grier's Compensation for 2013

Mark Grier (Age: 61)

## Profile

Mr. Grier has served as Vice Chairman since 2007 and a member of the Office of the Chairman of Prudential Financial since August 2002. From April 2007 through January 2008, he served as Vice Chairman overseeing the International Insurance and Investments division and Global Marketing and Communications. Mr. Grier was Chief Financial Officer of Prudential Insurance from 1995 to 1997 and has served in various executive roles. Prior to joining Prudential, Mr. Grier was an executive with Chase Manhattan Corporation.

## Prudential Financial Inc

### Compensation for 2013

| | |
|---|---|
| Salary | $1,190,000 |
| Bonus | $4,550,000 |
| Restricted stock awards | $2,776,242 |
| All other compensation | $83,892 |
| Option awards | $2,783,730 |
| Non-equity incentive plan compensation | $2,483,106 |
| Change in pension value and nonqualified deferred compensation earnings | $734,209 |
| **Total Compensation** | **$14,601,179** |

### Options Exercised for 2013

| | |
|---|---|
| Number of securities underlying options unexercisable | 203,489 |
| Shares acquired on exercise | 309,007 |

### Stock Ownership for 2014

| | |
|---|---|
| Number of shares owned | 250,285 |

# EXHIBIT E-3c. Carbone's Compensation for 2013

**Richard Carbone (Age: 66)**

## Profile

Richard J. Carbone has been a director of the Company since August 2013. Mr. Carbone was formerly Chief Financial Officer of Prudential Financial, Inc. from 1997 through 2013, and served as Executive Vice President until retiring from that position in February 2014. Mr. Carbone brings nearly four decades of experience in financial services, having held senior finance office positions in both the banking and securities industries, including Managing Director and Controller of Salomon Brothers and Senior Vice President and Controller of Bankers Trust Company. He began his career at Price Waterhouse & Co. Mr. Carbone received an M.B.A. from St. John's University and is a Certified Public Accountant. He was an officer in the United States Marine Corps from 1969 to 1972. Mr. Carbone is also a director on the Board of a non-profit organization focused on helping disabled adults and indigent children. Mr. Carbone is a member of the E*TRADE Bank board and a member of the Audit Committee, where he is designated an audit committee financial expert, and the Compensation Committee.

## Prudential Financial Inc

### Compensation for 2013

| | |
|---|---|
| Salary | $700,000 |
| Bonus | $2,500,000 |
| Restricted stock awards | $793,212 |
| All other compensation | $30,526 |
| Option awards | $795,355 |
| Non-equity incentive plan compensation | $927,205 |
| Change in pension value and nonqualified deferred compensation earnings | $366,174 |
| **Total Compensation** | **$6,112,472** |

### Options Exercised for 2013

| | |
|---|---|
| Number of securities underlying options unexercisable | 58,140 |
| Shares acquired on exercise | 164,319 |

### Stock Ownership for 2013

| | |
|---|---|
| Number of shares owned | 86,451 |

## E*Trade Financial Corp

### Director Compensation for 2013

| | |
|---|---|
| Fees earned or paid in cash | $35,000 |
| Stock awards | $35,000 |
| **Total Compensation** | **$70,000** |

we are early and the purchase accounting process, it would be premature to estimate the net impact on the results for the acquired companies. We will report results for Star and Edison on a one-month lag. As a result, the February 1 closing date means that our 2011 results will reflect 10 months of operating earnings to Star/Edison, Star and Edison, of course.

Moving to GAAP results for the Financial Services businesses. We reported net income of $213 million or $0.45 per share for the quarter. This compares to net income of $1.8 billion or $3.78 per share a year ago, which included a gain from the sale of our interest in the Wachovia joint venture of $2.95 per share. GAAP pretax results include amounts characterized at net realized investment losses of $912 million in the quarter. Now on this amount, $581 million represents changes in the value of derivatives and other items on our balance sheet that are driven by changes in interest rate inflection in foreign currency exchange rates during the quarter. About half of the $581 million relates to the strengthening of the yen during the quarter, and the remainder came mainly from an increase in interest rates. An additional $211 million came from product-related hedges, differences, of course, including NPR. We now report these items outside of adjusted operating income.

Impairments and credit losses were at $161 million in the quarter, primarily related to sub-prime holdings. Our total sub-prime holdings and amortized costs are $3.4 billion as of the year end, down from $4.3 billion a year ago. Pay downs during the quarter were about $600 million. The realized losses I just mentioned were partially offset by net gains from other general portfolio activities of about $40 million. Book value per share on a GAAP basis amounted to $63.11 at year end. This compares to $51.52 a year earlier. Gross unrealized losses on a general account fixed maturities were $3.1 billion at year-end 2010 compared to $4.4 billion a year ago. We were in a net unrealized gain position of $5.7 billion at year end 2010 compared to a net gain, unrealized gain position, of $1 billion a year earlier. Excluding unrealized gains and losses, and pension and post-retirement benefits, book value per share increased by $5.30 from a year ago to $59.48 at year end 2010.

Now I'll give you an update on where we stand on capital. First, I'm going to focus on the insurance companies. We're continuing to manage these companies at capital levels consistent what we believe are AA standards. Prudential Insurance began last year with an RBC ratio of 577. This included the benefit of about $2.7 billion of statutory capital that came from the sale of our increase in the Wachovia joint venture at the end of 2009. That was the sale, of course, of the Wachovia joint venture at the end of 2009.

Given PICA's excess statutory capital position in relation to our target, PICA paid dividends to Prudential Financial of $3 billion in 2010. While these dividends had no impact on our overall capital position, they did enhance our financial flexibility in funding the Star/Edison transaction. Favorable equity markets had a positive impact on PICA statutory capital during the year, and credit migration

## EXHIBIT E-4b. What Carbone Said about Dividends during PRU Q4 2011 Earnings Call

Book value per share, excluding unrealized investment gains and losses and pension and postretirement benefits, stood at $66.63 at year end, up $7.15 from a year ago and, of course, that is after giving effect to our common stock dividend of $1.45 per share, a 26% increase from the 2010 dividend.

Now our capital position. First, I'll focus on the insurance companies. We are continuing to manage these companies to capital levels, consistent with what we believe are AA standards. Prudential Insurance began last year with an RBC ratio of 533%. During the year, Prudential Insurance paid dividends totaling $1.6 billion to the holding company, Prudential Financial, Inc., essentially moving excess capital to the parent company and thereby enhancing our financial flexibility. While statutory results of 2011 are not yet final, we estimate that RBC for Prudential Insurance as of year end 2011 will be in the 500% range.

Our Japanese insurance companies recently reported their solvency margins as of September 30, 2011, using both the historical calculation method and a new method that becomes effective this year. These companies were comfortably above their targets under both methods. Effective January 1, we successfully merged the Star and Edison companies into Gibraltar Life. We are confident that at the end of their current fiscal year, which ends March 31, 2012, our Japanese companies will continue to report strong solvency margins relative to their targets.

Next, looking at the overall capital position for the Financial Services business. And as you know, we calculate our balance sheet capital capacity by comparing the statutory capital position in Prudential Insurance to a full 100% RBC ratio and then add capital capacity held at both the parent and other subsidiaries. We began 2011 with on-balance sheet capital capacity that we estimated was in the range of $4 billion to $4.5 billion. After adjusting for Star -- and that was after adjusting for the Star/Edison acquisition and the sale of Global Commodities. During 2011, we added about $3.5 billion of capital and used about $2 billion of that to fund the capital needs of our businesses. We returned about $1.7 billion to shareholders through our share repurchase program and our common stock dividend. The remaining authorization under the share repurchase program, which extends through 2012, is $500 million. The net result of these activities left our on-balance sheet capital capacity essentially unchanged from where we began 2011, about $4 billion to $4.5 billion. And this is consistent with the estimate we provided you in November. So really, nothing has changed of our -- on our capital capacity, that is. Of our $4 billion to $4.5 billion in capital capacity, we estimate that about half is readily deployable.

Now turning to the cash position at the holding company, the parent company. Cash and short-term investments net of outstanding commercial paper amounted to roughly $3 billion at year end. We continue to target maintaining at least a $1 billion liquidity cushion at the parent. The excess of our capital position

# EXHIBIT E-5

7805584 00190 E1028928

 **Prudential**



E302808.FC
R-02 8.82

Annuities Services
P.O. Box 13467
Philadelphia, PA 19176

Page 1 of 9

## Premier Retirement X Series
### Annuity Statement
### October 01, 2010 through December 31, 2010

>00190 7805584 001 092001
MICHAEL H. WU
CHRISTINE T. WU
138 STABLEFORD DR
GLEN ELLYN, IL 60137-3216

**Financial Professional:**
CHRISTOPHER J. CRALLE
CITIGROUP GLOBAL MARKETS INC.
1900 SPRING ROAD
OAKBROOK, IL 60523

| Annuity #: | E1 | Type: Non Qualified | Statement Date: | 01/03/2011 |
|---|---|---|---|---|
| Owner Name(s): | MICHAEL H. WU | | Issue Date: | 04/16/2010 |
| | CHRISTINE T. WU | | Annuity Date: | 02/01/2042 |
| Annuitant: | MICHAEL H. WU | | | |

Please review your statement and contact us within 30 days if you find any information you believe to be inaccurate. Note that any living benefit or death benefit values you may have are shown in the "Your Benefit Values" section of this statement. If you do not see a benefit that you selected, please contact us.

## Your Portfolio

| | **Previous Period** |
|---|---|
| Ending Account Value as of 09/30/2010 | $107,482.21 |
| Surrender Value as of 09/30/2010 | $98,266.44 |

| **Your Annuity Activity** | **Current Period** | **Year-to-Date** | **Since Issue** |
|---|---|---|---|
| Beginning Account Value | $107,482.21 | .00 | .00 |
| Purchase Payments | .00 | $100,000.00 | $100,000.00 |
| Credits | .00 | $6,000.00 | $6,000.00 |
| Withdrawals | .00 | .00 | .00 |
| Contract Fees and Charges* | ($260.40) | ($517.00) | ($517.00) |
| Investment Performance | $2,874.32 | $4,613.13 | $4,613.13 |
| **Ending Account Value (as of 12/31/2010)**** | **$110,096.13** | **$110,096.13** | **$110,096.13** |

**Your Surrender Value calculation if you had surrendered your annuity as of 12/31/2010:**

| Ending Account Value | $110,096.13 |
|---|---|
| Surrender Charge (CDSC) | ($9,000.00) |
| Other Fees and Charges | ($215.12) |
| **Surrender Value*** | **$100,881.01** |

**Spousal Highest Daily Lifetime(SM) 6 Plus**
Estimated Protected Withdrawal Value: $111,996.24
Estimated Annual Income Amount: $4,479.85
(Please refer to the "Your Benefit Values" section of this statement for additional details on these benefit values.)

* "Contract Fees and Charges" reflects certain fees and charges including, but not limited to: Contingent Deferred Sales Charge (CDSC), transfer fees, annual maintenance fees, or other benefit fees or charges, if applicable or imposed during the period covered by this statement, as of the statement date.

** "Ending Account Value" is your value prior to the application of any Surrender Charge (CDSC), Market Value Adjustment (MVA) and any Other Fees and Charges that may be applicable to your annuity contract.

*** "Surrender Value" is the value of your Annuity that would have been available if you had surrendered this contract effective as of the statement date. It equals the "Ending Account Value" for the current period, less any applicable fees and charges and any other adjustments as shown above. Depending on your contract, the

# EXHIBIT F-1

**From:** ClientServices <Clientservices@LordAbbett.com>
**To:** 'Michael Wu' <cs555iit@yahoo.com>
**Sent:** Monday, June 11, 2012 4:27 PM
**Subject:** RE: Questions on Dividends and Voting Proxy Information

Dear Mr. Wu:

Lord, Abbett & Co. LLC ("Lord Abbett") acts as sub-advisor to Prudential Investments LLC with regard to the AST Lord Abbett Core Fixed-Income Portfolio (the "Portfolio"), an investment portfolio of the Advanced Series Trust, (the "Trust"). The Trust is an investment vehicle for life insurance companies writing variable annuity contracts and variable life insurance policies as well as to certain tax-deferred retirement plans and is not available for direct investment by individuals. Lord Abbett is not the investment manager of the Portfolio or the Trust. Should you have any questions regarding the Portfolio, the Trust, or your contract or policy, you should speak with your financial advisor or the entity through whom you purchased your variable annuity contract or life insurance policy. Sincerely,

Tom Granaghan
Director, Marketing Information

# EXHIBIT F-2 the e-Mail from Eagle Fund Service

**From:** Janeen Whoolery <Janeen.Whoolery@EagleAsset.com>
**To:** Michael Wu <cs555iit@yahoo.com>
**Sent:** Tuesday, June 5, 2012 3:40 PM
**Subject:** RE: Questions on dividends and voting right

Mr. Wu - Thank you for your correspondence. We have investigated your concerns over the past two weeks to ensure that our industry partners are trading in an appropriate manner and to confirm that we are adhering to our internal procedures. However, as you are not a direct shareholder of the Eagle Family of Funds, we are not at liberty to discuss specific trades that may have occurred in a Prudential omnibus account.

Omnibus accounts combine the investments of many underlying shareholders into one large account that is then registered with a mutual fund company. The fund company's only customer, therefore, is the intermediary whose name is registered on the omnibus account. Prudential has a sales agreement with the Eagle Family of Funds to offer our funds on their platform, along with other funds, in an omnibus arrangement.

As part of our investigation into your concerns, we have confirmed that the Eagle Family of Funds is in compliance with SEC Rule 22c-2, which dictates a fund company's responsibility to contract with intermediaries for the purpose of detecting potential market timing activities. Regarding your concerns about specific trades within your account at Prudential, your questions are best directed to them.

Best regards,

Janeen Whoolery
Eagle Fund Services

## EXHIBIT F-3

**From:** MarsicoFunds <MarsicoFunds@umb.com>

**To:** 'Michael Wu' <cs555iit@yahoo.com>

**Sent:** Wednesday, May 2, 2012 5:43 PM

**Subject:** RE: Dividends and Voting Rights of "Marsico Capital Growth Focus"

Dear Mr. Wu,

Thank you for contacting the Marsico Funds.

For regulatory reasons, we are only able to comment on the Marsico Funds offered directly to the public. We are not able to comment on Marsico Products offered by different entities such as Prudential. For information about Marsico products offered by prudential, please contact that company.

I regret that I am not able to provide a specific contact number.

If you have any further questions or comments, please reply to this email or contact our Shareholder Services Department toll free at (888) 860-8686 between 8 a.m. and 8 p.m. Eastern Time, Monday through Friday and a representative would be happy to assist you.

Sincerely,

**Ed Schoenfeld**

Registered Representative – UMB Distribution Services, LLC

http://www.marsicofunds.com/